**Melissa HINES, on Behalf of her minor daughter, Amber SEVIER, Petitioner–Appellant,**

v.

**SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent–Appellee.**

No. 91–5027.

United States Court of Appeals, Federal Circuit.

July 31, 1991.

M. Susan Sacco, of Broad and Cassel, Maitland, Fla., argued for petitioner-appellant. Of counsel was Berry J. Walker, Jr.

Constance A. Wynn, of the Civ. Div., Dept. of Justice, Washington, D.C., argued for respondent-appellee. With her on the brief were Stuart M. Gerson, Asst. Atty. Gen., and Barbara C. Biddle.

Before MICHEL and LOURIE, Circuit Judges, and SKELTON, Senior Circuit Judge.

MICHEL, Circuit Judge.

Melissa Hines (now known as Melissa Hines Sevier, herein "Sevier"), on behalf of her minor daughter, Amber Sevier, appeals the judgment of the United States Claims Court denying her compensation under the National Vaccine Injury Compensation Program (Vaccine Program), established pursuant to the National Childhood Vaccine Injury Act (Vaccine Act), 42 U.S.C. §§ 300aa–1 through 300aa–34 (1988 & Supp. I 1989), for injuries allegedly caused by the measles, mumps, and rubella (MMR) vaccine. *Hines v. Secretary of the Dep't of Health and Human Servs.*, 21 Cl.Ct. 634 (1990). Because the Claims Court correctly concluded that the special master's decision, finding that Sevier did not prove by a preponderance of the evidence that her daughter's loss of hearing was caused by the MMR vaccine, was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, we affirm.

## BACKGROUND

Amber Sevier was born to petitioner on October 5, 1987. She was delivered without complications, and weighed six pounds six ounces at birth. Her APGAR scores were 8 and 9 out of a perfect 10.[1] She was discharged from the hospital in good condition on October 7, 1987.

When she received her first DPT (diphtheria-pertussis-tetanus) and OPV (polio) vaccinations on March 3, 1988, Amber experienced no apparent side effects. Nor did she have any adverse reactions to her second DPT and OPV vaccinations on May 12, 1988. Thereafter, Amber was diagnosed as having bilateral otitis media (middle ear infections in both ears) on three separate occasions: August 15, 1988; November 1, 1988; and November 11, 1988. On each occasion, amoxicillin was prescribed. Then on January 26, 1989, Amber received her third DPT and her MMR vaccinations.

Prior to this MMR vaccination, Amber showed no signs of hearing impairment, but rather responded normally to the sounds of music, automobiles, and human voices. She was also able to speak six words. But on February 1, 1989, six days after her first MMR vaccination, Amber was taken to the emergency department at Sand Lake Hospital because of a fever of 104.4 degrees. According to the hospital records, Amber had been ill for the prior two days, i.e., four days after the vaccine was administered, with a cough and yellow nasal discharge. She had had three loose stools, had vomited twice, and had pulled on her ears throughout the day prior to the emergency department visit. Upon examination on the sixth day, Amber showed signs of bilateral otitis media and respiratory problems, and was diagnosed as having pneumonia. The doctor again prescribed amoxicillin.

The following day, February 2, 1989, petitioner took Amber to the Orange County Health Department Pediatric Clinic, where she was diagnosed with bilateral otitis media and possible bilateral pneumonia. An antibiotic was prescribed. On her first follow-up visit of February 6, both her otitis media and her pneumonia showed improvement. A new prescription was given. By her next follow-up examination of February 16, her infections were gone.

At about that time or shortly thereafter, Amber's mother and grandmother started to notice that Amber did not respond to their voices, and seemed to ignore them. She also appeared to lose her equilibrium and her speech ability. This process apparently continued over a period of weeks. Sometime later, Amber's mother became very concerned when she dropped some pans on the floor next to Amber and Amber did not react. She then beat the pans near Amber's head and Amber did not react until she visually noticed what her mother was doing. As a result, Amber's mother took Amber back to the pediatric clinic on March 27, 1989, to have her hearing examined. She was diagnosed as suffering from a moderate to severe bilateral sensorineural hearing loss. Subsequent examinations have shown that Amber has lost 95% of her hearing in the left ear and 99% in the right ear.

On August 25, 1989, Sevier filed a petition for compensation under the Vaccine Program, pursuant to 42 U.S.C. § 300aa–11 (Supp. I 1989), alleging that her hearing loss was caused by the MMR vaccine. Sevier's petition was referred to a special master for decision, *see* 42 U.S.C. § 300aa–12(d)(1), and a hearing was held in Orlando, Florida, on April 25, 1990.

At this hearing, Sevier presented evidence, including medical records and expert testimony, to the special master. The government did not participate in the hearing, but did submit evidence to the special master including a medical review, signed by three doctors employed by the Department of Health and Human Services, which recommended denial of compensation based on a lack of evidence in the medical records showing that the MMR vaccine caused Amber's hearing loss. By a decision dated June 22, 1990, the special master deter-

---

1. Named for Dr. Virginia Apgar, the APGAR test measures five elements, summarized in mnemonic form as *a*ppearance, *p*ulse, *g*rimace, *a*ctivity, and *r*espiration.

mined that petitioner was not entitled to compensation for Amber's hearing loss under the Vaccine Program because she was not able to prove by a preponderance of the evidence that Amber's hearing loss was caused by the MMR vaccine.

Pursuant to 42 U.S.C. § 300aa–12(f), Sevier filed a Motion for Review of the special master's decision on July 20, 1990. In its October 15, 1990 decision, the Claims Court determined that neither the special master's fact findings nor his legal conclusion that petitioner had not proven she was entitled to compensation were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 42 U.S.C. § 300aa–12(e)(2)(B), and therefore sustained the special master's decision. Sevier appeals as provided in § 300aa–12(f).

We have jurisdiction over Sevier's appeal pursuant to 28 U.S.C. § 1295(a)(3) (1988).

## DISCUSSION

### I

We consider at the outset an issue which, though not raised by the parties, goes to our jurisdiction to decide this appeal and thus must be considered sua sponte: whether the 1989 amendments to the Vaccine Act render our review merely advisory and thus impermissible under article III of the Constitution.

■■■ As originally enacted, the Vaccine Act required an unsuccessful petitioner, within 90 days of the Claims Court's final decision, to file "an election in writing to accept the judgment or to file a civil action for damages for such injury or death." 42 U.S.C. § 300aa–21(a)(2) (1988). In *Brown v. Secretary, Dep't of Health and Human Servs.*, 920 F.2d 918 (Fed.Cir.1990), we noted that because the petitioner in that case had, prior to appeal, already elected to accept the judgment of the Claims Court, our review was "appropriate under Article III of the Constitution because there is no risk our opinion would be impermissibly advisory." *Id.* at 921–22 n.* *. We further stated that "we intimate no view on the reviewability in this court of cases in which elections are not made before appeal." *Id.*

In 1989 the Vaccine Act was amended to provide that an election as to whether to accept the judgment is not required until "[a]fter judgment has been entered by the United States Claims Court or, if an appeal is taken ... *after the appellate court's mandate is issued....*" Pub.L. No. 101–239, § 6601(n)(1)(A), 103 Stat. 2292 (1989) (codified at 42 U.S.C. § 300aa–21(a) (Supp. I 1989)) (emphasis added). Since in the instant case, the evidentiary record had not closed prior to the December 19, 1989 effective date of the 1989 amendments, this new election rule governs this case. *See* Pub.L. No. 101–239, § 6601(s)(1)(C), 103 Stat. at 2293 (specifying effective dates of the 1989 amendments). Therefore, petitioner is not required to elect whether or not to accept the judgment of the Claims Court denying compensation until we decide her appeal, and thus in contrast to *Brown*, the issue of the constitutionality of our review is squarely before us.

Article III of the U.S. Constitution extends the judicial power to various types of "cases" and "controversies." This "case or controversy" requirement of article III has been interpreted as barring federal courts from rendering advisory opinions:

A "controversy" in this sense must be one that is appropriate for judicial determination.... The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

*Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937) (citations omitted).

It could be argued, as we implied in *Brown,* that the amendment of § 300aa–21(a) to permit a petitioner to postpone deciding whether to accept the judgment of the Claims Court until after appeal renders our decision in that appeal impermissibly advisory. According to such an argument, since the judgment does not have to be accepted, our decision would not

provide "specific relief through a decree of a conclusive character" as to "a real and substantial controversy," *Aetna*, 300 U.S. at 241, 57 S.Ct. at 464, but rather would merely advise the petitioner what the result would be, hypothetically, if he or she elected to be bound by the Claims Court's judgment.

Though superficially plausible, on closer examination this argument fails. The statute as amended permits an unsuccessful petitioner to either "accept the judgment or to file a civil action for damages" for the vaccine-related injury. 42 U.S.C. § 300aa–21(a)(2). But it does *not* permit a petitioner to file a new petition under the Vaccine Program itself. Therefore, our decision as to the denial of compensation *is* a final and conclusive adjudication of a definite and concrete dispute, namely, the petitioner's cause of action against the government *under the Vaccine Program.* The existence of another possible cause of action (e.g., against a physician, hospital or vaccine manufacturer in tort law) does not make the dispute as to a petitioner's rights under the Vaccine Program any less genuine and does not render our decision merely advisory.

We therefore conclude that the amendment to the Vaccine Act permitting a petitioner after appeal to elect not to accept the final judgment of the Claims Court does not circumvent the case or controversy requirement of article III of the Constitution, and thus is no bar to our exercise of jurisdiction.

## II

We turn next to our standard of review in cases arising under the Vaccine Act.

As originally enacted, the Vaccine Act provided that "[u]pon objection ... to the proposed findings of fact or conclusions of law prepared by the special master or upon the court's own motion, the [Claims] court shall undertake a review of the record of the proceedings and may thereafter make a de novo determination of any matter and issue its judgment accordingly, including findings of fact and conclusions of law...." 42 U.S.C. § 300aa–12(d)(1)

(1988). The decision of the Claims Court, whether based in whole or in part on the master's report, could then be appealed to the Federal Circuit. We have held that as to cases decided under this statutory scheme, our review of a Claims Court decision is for correctness in questions of law and for clear error in findings of fact. *Bunting v. Secretary of the Dep't of Health and Human Servs.*, 931 F.2d 867, 871 (Fed.Cir.1991) (pre–1989 case).

■ In 1989, Congress amended the Act to provide that the Claims Court shall not set aside a special master's findings of fact or conclusions of law unless it determines them to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...." Pub.L. No. 101–239, § 6601(h)(2)(B), 103 Stat. 2289–90 (1989) (codified at 42 U.S.C. § 300aa–12(e)(2)(B) (Supp. I 1989)). This standard of review applies to all cases filed after the effective date of the amendment, as well as to cases, such as this one, pending on the effective date, but as to which the evidentiary record had not closed. Pub.L. No. 101–239 at § 6601(s)(1)(A), (C), 103 Stat. at 2293.

We are thus presented with an issue of first impression: When the Claims Court has reviewed the decision of a special master under the arbitrary and capricious standard of 42 U.S.C. § 300aa–12(e)(2)(B), as amended in 1989, under what standard do we review the Claims Court's decision? In resolving this question, we shall begin by examining the standard of review we apply in analogous situations.

For example, when the Claims Court reviews an agency's decision to reclassify job positions we have held that "[w]hether the Claims Court correctly determined that [the agency] did not act arbitrarily or capriciously is ... a question of law, subject to de novo review." *Bosco v. United States*, 931 F.2d 879, 882 (Fed.Cir.1991) (citations omitted).

We have also applied a similar standard in reviewing the Court of International Trade's deferential review of International Trade Commission (ITC) decisions. For example, where that court reviews a determi-

nation by the ITC under an "arbitrary and capricious" standard, we have held that the court's determination is a question of law which on appeal we review de novo. *Matsushita Electric Industrial Co. v. United States,* 929 F.2d 1577, 1578 (Fed.Cir.1991). We thus essentially review "the underlying decision of the ITC itself." *Id.* Similarly, we have held that where the Court of International Trade has reviewed an ITC determination as to whether it was supported by substantial evidence, this court likewise reviews the underlying ITC determination for substantial evidence. *American Permac, Inc. v. United States,* 831 F.2d 269, 273 (Fed.Cir.1987), *cert. dismissed,* 485 U.S. 901, 108 S.Ct. 1067, 99 L.Ed.2d 229 (1988). *See also Matsushita Electric Industrial Co. v. United States,* 750 F.2d 927, 932 (Fed.Cir.1984) ("[R]esolution of whether the Court [of International Trade] correctly held that the Commission's decision was not supported by substantial evidence requires consideration of the evidence presented to and the analysis by the Commission. Thus, to determine whether the Court correctly applied the statutory standard ... we must review the Commission's decision." (Footnote & citations omitted.)); *Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556, 1559 n. 10 (Fed.Cir.1984) ("We review that court's review [for substantial evidence] of an ITC determination by applying anew the statute's express judicial review standard.").

The issue in the instant case is also analogous to that which arises when a district court reviews, under a clearly erroneous standard, findings made by a special master. In *Milliken Research Corp. v. Dan River, Inc.,* 739 F.2d 587, 222 USPQ 571 (Fed.Cir.1984), we considered the nature of a district court's decision to set aside a special master's report, and stated that "the decision of the district court holding a finding of fact by the master clearly erroneous is not itself a 'finding of fact', and our review of that decision is, thus, not controlled by Rule 52(a)." *Id.* at 593, 222 USPQ at 576. Rather, we held that "we must first review, *as a matter of law,* the correctness of the district court's setting aside any factual finding by the master

and, if that is upheld, review any substitute or additional finding by the district court under the 'clearly erroneous' standard of Rule 52(a)." *Id.,* 739 F.2d at 593, 222 USPQ at 576 (emphasis added).

■ Our precedent thus shows a consistent pattern which provides us with clear guidance in the instant situation. Like a decision of the Claims Court or the Court of International Trade sustaining an agency decision as not arbitrary and capricious, and like a determination by a district court that a special master's decision is not clearly erroneous, a Claims Court vaccine decision upholding a special master must be viewed as a *legal* conclusion that the master's decision was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...." 42 U.S.C. § 300aa–12(e)(2)(B). We therefore hold that in a case arising under the 1989 amendments to the Vaccine Act, we review *de novo* the Claims Court's determination as to whether or not the special master's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. In effect, then, we review the underlying decision of the special master under the arbitrary and capricious standard of § 300aa–12(e)(2)(B). *Cf. Matsushita,* 929 F.2d at 1578.

### III

Having determined our standard of review applicable to appeals arising under the amended Vaccine Act, we now apply that standard to the facts of the instant case.

■ Under the Vaccine Act, a petitioner seeking compensation for injuries caused by a covered vaccine must prove entitlement to compensation under either of two bases. First, a petitioner may recover when an injury or condition listed in the Vaccine Injury Table, 42 U.S.C. § 300aa–14 (Supp. I 1989), begins to manifest itself within the time specified in the Table for the vaccine in question. *Id.* at § 300aa–11(c)(1)(C)(i). Causation in such cases is presumed. *See Bunting,* 931 F.2d at 872. Second, for injuries not listed in

the Table, or which do not occur within the time period stipulated in the Table, the Vaccine Act authorizes recovery only if the petitioner proves actual causation. 42 U.S.C. at § 300aa–11(c)(1)(C)(ii). The petitioner bears the burden of proving, by a preponderance of the evidence, entitlement to compensation by either of these methods. *Id.* at § 300aa–13(a)(1)(A). Additionally, the special master must determine that there is not a preponderance of the evidence showing that the injury was "due to factors unrelated to the administration of the vaccine...." *Id.* at § 300aa–13(a)(1)(B). Since Amber's hearing loss is not one of the conditions or reactions listed in the Vaccine Injury Table in connection with the MMR vaccine, in order to receive compensation, Sevier must actually prove by a preponderance of the evidence that the MMR vaccine caused Amber's hearing loss.

The Claims Court correctly stated that causation in fact requires "proof of a logical sequence of cause and effect showing that the vaccination was the reason for the injury." *Hines*, 21 Cl.Ct. at 643 (quoting *Strother v. Secretary of the Dep't of Health and Human Servs.*, 18 Cl.Ct. 816, 820 (1989)). Sevier appears not to dispute this formulation of the causation requirement. Rather, she maintains that she met her burden of proving causation. She contends that she established that Amber's asymmetrical, bilateral sensorineural hearing loss was of the type and occurred at the time expected with an adverse reaction to an MMR vaccination, and that the special master's findings to the contrary were arbitrary and capricious. In support of this contention, Sevier raises several arguments.

First, Sevier takes issue with the special master's discussion of the temporal relationship between the inoculation and the onset of the hearing loss, and his determination that "[n]ot only did Amber not experience a measles-like rash, the symptoms she did experience followed too closely after the vaccination to be attributed to the measles vaccine." *Hines*, slip op. at 8 (Special Master June 22, 1990). She argues that the special master erred in relying on a medical textbook which was not introduced at the hearing, Behrman & Vaughan, *Nelson Textbook of Pediatrics* (13th ed. 1987), for the proposition that any side effects that may follow the MMR vaccination will occur within 6–14 days of vaccination. *See Hines*, slip op. at 6 (Special Master June 22, 1990). Specifically, she argues that the special master should not have relied on any material outside the record developed at the hearing, and that even if he could have taken "judicial notice" of the incubation period of measles as stated in the Nelson treatise, he erred in failing to inform the parties in advance that he intended to do so. She further contends that the incubation period of measles is in any event not the proper subject for the taking of judicial notice. She also challenges the period specified in Nelson as unreliable in view of her expert's testimony that the symptoms occurred within the expected period. The special master recognized that Amber's symptoms started at four days or earlier, and based on the six-day starting point of Nelson, found that they followed "too closely."

█ As the Claims Court correctly pointed out, the Vaccine Act states that the procedural rules to be applied by special masters shall "provide for a less-adversarial, expeditious, and informal proceeding for the resolution of petitions," and specifically that they shall "include flexible and informal standards of admissibility of evidence." 42 U.S.C. § 300aa–12(d)(2)(A), (B). The Claims Court has correctly interpreted this provision to mean that the Federal Rules of Evidence need not be followed in proceedings under the Act, and under the authority granted by 28 U.S.C. § 2071 (1988) and 42 U.S.C. § 300aa–12(d)(2), the Claims Court has promulgated rules of procedure for use by special masters in vaccine cases. One of these rules states: "In receiving evidence, the special master will not be bound by common law or statutory rules of evidence. The special master will consider all relevant, reliable evidence, governed by *principles of fundamental fairness to both parties.*" Rule 8(b), Vaccine Rules of

the Office of Special Masters (Appendix J to the RUSCC) (emphasis added).

■ Sevier argues that the medical textbook should not have been relied upon because she was not given an opportunity to be heard prior to the taking of judicial notice, as provided by Fed.R.Evid. 201(e), and that this omission violates "the principles of fundamental fairness." But were the "fundamental fairness" requirement considered to include everything commanded by the Federal Rules of Evidence, the statutory mandate for an "informal proceeding" and "flexible and informal standards of admissibility," 42 U.S.C. § 300aa–12(d)(2), would be nullified. Here, though Sevier did not have an opportunity to object before the special master used the medical textbook, she *did* have a chance to discredit and rebut the information contained in that textbook on review before the Claims Court. Yet, as that court stated, she "ma[de] no attempt in her motion for review to discredit the authoritativeness of the textbook the Special Master consulted, nor [did she] attempt to rebut the data on incubation periods contained therein." *Hines*, 21 Cl.Ct. at 647. Under these circumstances, we cannot say that the special master's failure to inform her in advance that he intended to take judicial notice violated any "principles of fundamental fairness." In any event, even if it was error, it was harmless because, as explained below, the special master's decision was based on a number of factors and she has not shown that reliance on the judicially noticed incubation period derived from the textbook was likely critical to the result.

■ Sevier also argues that the incubation period of measles is not a fact that should be subject to judicial notice, even under informal rules. But even the Federal Rules of Evidence specifically permit the taking of judicial notice of a fact which is "not subject to reasonable dispute" because it is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be ques-

tioned." Fed.R.Evid. 201(b). Well-known medical facts are the types of matters of which judicial notice may be taken. *Compare Franklin Life Ins. Co. v. William J. Champion & Co.*, 350 F.2d 115, 130 (6th Cir.1965), *cert. denied*, 384 U.S. 928, 86 S.Ct. 1445, 16 L.Ed.2d 531 (1966) (taking judicial notice of the fact that cancer does not manifest itself quickly), *with Hardy v. Johns–Manville Sales Corp.*, 681 F.2d 334, 347–48 (5th Cir.1982) ("The proposition that asbestos causes cancer, because it is inextricably linked to a host of disputed issues ... is not at present so self-evident a proposition as to be subject to judicial notice."). Here, Sevier has offered no evidence that the incubation period of measles is disputed among treatise writers. Moreover, the special master found, based on his first-hand perception of her testimony, that Sevier's expert was uncertain about the incubation period. It thus appears that the taking of judicial notice would have been proper even under the Federal Rules of Evidence. In such a case, where the taking of judicial notice would be permissible even under the Federal Rules of Evidence, we certainly cannot say that it was contrary to the more liberal "fundamental fairness" requirement of the Vaccine Rules.

■ Sevier further argues that the special master misstated the facts and misread the record when he described Amber's hearing loss as *symmetrical*, since Dr. Dimitrov, petitioner's expert, testified that Amber's hearing loss was *asymmetrical*. Since asymmetry is characteristic of hearing loss caused by measles, Sevier contends that this misstatement led the special master and the Claims Court to erroneously discount the importance of the asymmetry of Amber's hearing loss as proof of causation.[2]

The Claims Court, however, did not decide whether the special master acted arbitrarily and capriciously in finding that Amber's hearing loss was symmetrical. Instead, the court explained that even assuming, *arguendo*, that the special master erred, since the decision to deny compensa-

---

2. Whether asymmetry is also indicative of hearing loss caused, not by measles, but directly by

the MMR vaccine itself, is unclear.

tion was based on many factors, not simply the symmetry of Amber's hearing loss, any such error was harmless because it did not change the outcome of the case. In any event, the master did not ignore the importance of this factor; he simply did not give it the controlling weight Sevier urges he should have.

Rather, as the Claims Court correctly noted, the special master considered numerous factors in his decision to deny compensation. In addition to the factors of symmetry and timing, on which Sevier focuses, the master made findings on various other factors. He noted that Amber's symptoms were indicative of her ear infections and pneumonia rather than symptoms of measles, and that since there was no measles rash, it was very unlikely that Amber contracted measles. He also noted that she had suffered from ear infections in August and November 1988, *prior* to her MMR vaccination on January 26, 1989. Furthermore, the special master found that Amber's hearing loss was progressive, which he concluded was more suggestive of a congenital (hereditary) defect than of measles. The master also found that the medical testimony and medical literature were unpersuasive in showing that administration of the MMR vaccine, as opposed to contracting measles, could have caused the hearing loss: Indeed the master found that "[t]he medical evidence that the measles vaccine *can* cause nerve deafness is very weak," and that "the preponderance of the evidence would not support a finding that it did cause the nerve deafness in this case." *Hines*, slip op. at 8 (Special Master June 22, 1990) (emphasis in original). In short, the special master appears to have considered the relevant evidence in the record as a whole, drawn plausible inferences from that evidence, and articulated a basis for his decision which is rational.

■ Sevier raises various other issues in her appeal, none of which merit extended discussion. Her contentions are essentially that various pieces of evidence should have been given more or less weight by the special master. Such arguments as to the

weighing of evidence, particularly where, as here, witness credibility is involved, do not demonstrate reversible error. Regardless of whether the Claims Court, or we, would have found different facts on a retrial of the case, the issue which the Claims Court resolved and which we now review is only whether the findings and conclusions of the special master were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...." 42 U.S.C. § 300aa–12(e)(2)(B).

The "not in accordance with law" aspect of the standard of review is not really involved here, there being no dispute over statutory construction or other legal issues. Nor is the "abuse of discretion" prong, ordinarily used where the tribunal under review *had* a finite range of discretion (e.g. to select a penalty, or to award a specific sum as damages, from within a range of permissible alternatives) really implicated in this case.

The issue before the special master, rather, was whether the evidence submitted by the petitioner warranted a conclusion that the vaccine caused the injury. The review applicable to this determination is under the "arbitrary and capricious" standard. While no uniform definition of this standard has emerged, it has been formulated in a variety of ways which suggest its meaning: "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971) (review of agency rulemaking under the Administrative Procedures Act); "an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.,*

463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) (review of agency rulemaking); agency must articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made," *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962) (review of agency adjudication); "proof that there was 'no reasonable basis' for the administrative decision will also suffice [to show arbitrary and capricious conduct], at least in many situations," *Prineville Sawmill Co., Inc. v. United States,* 859 F.2d 905, 913 (Fed.Cir.1988) (quoting *Keco Ind., Inc. v. United States,* 492 F.2d 1200, 1203–04, 203 Ct.Cl. 566 (1974)) (review of pre-award bid protest action against letting of government contract); reviewing court must "guard against an agency's drawing inferences that are 'arbitrary' in relation to the facts found, no matter how substantial may be the support for those facts," *Midtec Paper Corp. v. United States,* 857 F.2d 1487, 1498 (D.C. Cir.1988) (review of agency adjudication); "the central focus of the arbitrary and capricious standard is on the rationality of the agency's 'decisionmaking,' rather than its actual decision," *United States v. Garner,* 767 F.2d 104, 116 (5th Cir.1985); "whether the decision was based on a consideration of relevant factors, whether there has been a clear error of judgment and whether there is a rational basis for the conclusions ...," *Mobil Oil Corp. v. Department of Energy,* 610 F.2d 796, 801 (Temp.Emer.Ct.App.1979), *cert. denied,* 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980) (review of agency rulemaking) (quoting *Texaco, Inc. v. Federal Energy Admin.,* 531 F.2d 1071, 1076–77 (Temp.Emer. Ct.App.1976)).

We need not and do not adopt any one of these definitions for use in vaccine cases; it is clear from the cases cited above, however, that regardless of the precise formulation used, "arbitrary and capricious" is a highly deferential standard of review. If the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate.

In this appeal, we have carefully reviewed the special master's decision, the Claims Court's treatment of the assignments of error raised by petitioner, and all of the arguments raised. We can discern no error in the Claims Court's conclusion that the special master's decision was not, as a matter of law, arbitrary or capricious.

## CONCLUSION

We review a decision of the Claims Court upholding a special master's denial of compensation under the Vaccine Program as to whether or not the court correctly concluded that the master's decision was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Here, Sevier's attack on particular findings by the special master fails to demonstrate that the master's decision, based on the totality of the circumstances in the record as a whole, was arbitrary or capricious. Accordingly, the judgment is

AFFIRMED.