Craig & Catherine A. TWETEN, Legal
Representatives for Christopher
Cody Tweten, Petitioners,

v.

SECRETARY OF the DEPARTMENT
OF HEALTH AND HUMAN
SERVICES, Respondent.

No. 90–549V.

United States Claims Court.

Aug. 22, 1991.

Andrew Hutton, Wichita, Kan., for petitioners.

Gerard Fischer, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for respondent.

## ORDER

NETTESHEIM, Judge.

This case is before the court on petitioners' motion for review of a special master's dismissal of their petition for compensation under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa–1 – 300aa–34 (1988), *as amended* by several public laws codified in 42 U.S.C.A. §§ 300aa–1 – 300aa–34 (West Supp.1991) ("the Act"). Argument is deemed unnecessary. The issue is whether the record as a whole supports the special master's findings.

## FACTS

The following facts are derived from the special master's report and the record before the special master. Christopher Tweten was born on March 18, 1987, in Minot, North Dakota, to Craig and Catherine Tweten ("petitioners"). He appeared to develop in a normal manner for the first four months of his life. On May 13, 1987, Christopher had his first DPT vaccination at the office of Dr. Steven R. Mattson, a pediatrician, in Minot, North Dakota. No evidence of an adverse reaction to this initial vaccination was recorded in the doctor's records.

On July 15, 1987, Dr. Mattson administered the second DPT vaccination to Christopher. Both parents submitted affidavits with the petition stating that on July 17,

1987, Christopher arched his back in a severe manner and put his arms down to his sides for approximately 30 seconds. However, at the evidentiary hearing, Mrs. Tweten testified that this arching of the back occurred either on July 16 or July 17. According to Mrs. Tweten's testimony, her mother stayed with Christopher during a visit over August 1–2 and similarly witnessed the arching of his back. In addition, Mrs. Tweten's mother noticed the rolling back of Christopher's eyes.

Christopher was taken to see Dr. Mattson on August 3, 1987. After making an initial impression of infantile spasms/neonatal seizures in Christopher's medical record, Dr. Mattson referred Christopher to Dr. Blas Zelaya, a pediatric neurologist with an extensive and ongoing clinical practice. In his August 12, 1987 letter of referral to Dr. Zelaya, Dr. Mattson noted that Christopher apparently had seizures "for the last two to three weeks." This would place the onset of the seizures towards the end of July.

After examining Christopher on August 17, 1987, and again on September 8, 1987, Dr. Zelaya recommended a period of hospitalization for Christopher at St. Alexius Hospital. In Christopher's September 10, 1987 History and Physical Examination report for St. Alexius, Dr. Zelaya recorded Mrs. Tweten's statement that Christopher had received the DPT immunization approximately "one week" prior to the seizures. He commented: "[T]he temporal relationship with DPT immunization is not quite clear … it appears to be quite distant from the onset of the seizures…." Dr. Zelaya recorded Christopher's pattern of seizures at three to three and one-half months of age, or approximately mid-June to early July 1987. However, he changed the onset of the seizures to four months, or approximately mid-July 1987. In his deposition Dr. Zelaya testified that the correction came after further consultation with Mrs. Tweten, who had initially told him at the time of hospitalization that the onset of Christopher's seizures was at three or three and one-half months old. Later, after Dr. Zelaya's attempt to secure the exact date, she told him that the seizures began

one month prior to her first visit with Dr. Zelaya on August 17, 1987. Since Dr. Zelaya knew that Christopher was five months old at that time, he changed the date of onset accordingly.

Christopher remained at the hospital from September 10, 1987, to October 12, 1987. Tests revealed irregular brain wave patterns, and drugs were administered to control his spasms. Upon release Dr. Zelaya recorded Christopher's diagnosis as being myoclonic seizures and infantile spasms of which the etiology was unknown.

With continuing infantile spasms and a noticeable developmental delay, Christopher was referred to the Mayo Clinic in Rochester, Minnesota, on January 12, 1988. He was examined and evaluated by Dr. Robert V. Groover, who recorded the following history for Christopher: "His mother noted probable tonic seizures at approximately three to four days after his second DPT…." In reference to the causal connection of the DPT vaccination and Christopher's neurological problem, Dr. Groover regarded the etiology of his infantile spasms as "not clear."

Petitioners filed a petition for vaccine compensation on June 20, 1990, with the Claims Court, alleging that Christopher's injuries resulted from the DPT innoculation that he received on July 15, 1987. The special master convened a "limited hearing" on March 15, 1991, to take Mrs. Tweten's testimony to determine whether the onset of Christopher's seizures occurred within the three-day period stipulated by section 300aa–14(a) of the Act.

After considering testimony from Christopher's mother, the deposition of his pediatric neurologist, Dr. Zelaya; affidavits; medical records; and other submissions, Chief Special Master Gary J. Golkiewicz found that petitioners' claims were not sufficiently substantiated. In particular the special master took issue with Mrs. Tweten's explanation of the events and their timing:

> Mrs. Tweten explained that her recollection now is clearer than her recollection at the time of the shot, nearly four years

ago. She now remembers clearly the first occurrence even though she may not have been so clear about it at the time....

*Tweten v. Secretary of HHS*, No. 90–549V, slip op. at 6, 1991 WL 117739 (Cl.Ct.Spec.Master June 13, 1991). Doubting the reliability of Mrs. Tweten as a witness, the special master commented:

It strains credulity to accept that this time relationship was not remembered when the treating physician probed for information in an attempt to discern the cause of Christopher's problems, but was remembered at some later time. This is not a situation of miscommunication or misunderstanding of the questions asked. What Mrs. Tweten is suggesting is that she gave incorrect information to the doctor but somehow is able to give the correct information to the court. This court does not believe Mrs. Tweten's testimony. What is clear from the record is that Mrs. Tweten was unable at the time to provide the specific time of onset of the seizures in relation to the DPT even when questioned closely about it....

*Id.*, slip op. at 6–7.

On July 5, 1991, petitioners moved for review by the Claims Court. According to petitioners, the record supported a finding that the onset of the seizures was within three days after the vaccine was administered. Petitioners also argued that the special master's decision was reached "regardless of the fact that Mrs. Tweten testified that it was not until much later that she was pressed to investigate the *exact* date of the onset, rather than an approximate date of the onset." Pets' Br. filed July 5, 1991, at 8 (emphasis in original).

Christopher still suffers from mental retardation and developmental delay due to his seizure disorder.

## DISCUSSION

### 1. *Standard of review*

■ On review of a decision by a special master, the Claims Court is authorized to "set aside any findings of fact or conclu-sion[s] of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law." 42 U.S.C.A. § 300aa–12(e)(2)(B). The Federal Circuit recently affirmed that "this standard of review applies to all cases filed after the effective date of the [1990] amendment ...," *Hines v. Secretary of HHS*, 940 F.2d 1518, 1523 (Fed.Cir.1991), including the case at bar. The issue of whether the evidence of record warrants a conclusion that a vaccine caused an injury calls for review under the arbitrary and capricious standard. *Id.* at 1527. According to the Federal Circuit, " '[A]rbitrary and capricious' is a highly deferential standard of review...." *Id.* at 1528.

The Supreme Court, in the context of reviewing a federal agency's decision under the Administrative Procedure Act, 5 U.S.C. § 706 (1988), explained that under the arbitrary and capricious standard a reviewing court must consider "whether the [federal agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens To Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971) (citing cases) (quoted in *Hines*, at 1527). "Although ... [the] inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one...." *Citizens To Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. at 824; *see also Hyundai Elecs. Indus. Co. v. ITC*, 899 F.2d 1204, 1209 (Fed.Cir.1990) (the "touchstone" of arbitrary, capricious, and abuse of discretion standard of review is rationality—consideration of all relevant factors absent a clear error of judgment). In *Hines* the Federal Circuit charted the course for a special master's review: 1) considering the relevant evidence in the record as a whole; 2) drawing plausible inferences from the evidence; and 3) articulating a basis for decision that is rational. *Hines*, at 1527, 1528.

### 2. *Review of the special master's factual analysis*

The issue is whether the special master's decision, with respect to the timing of the

DPT shot in relation to the onset of Christopher's seizures was arbitrary, capricious, or an abuse of discretion. First, petitioners claim that the discrepancy between petitioners' claimed date of onset and the dates recorded by the medical professionals does not provide a sufficient basis for rejecting petitioners' testimony and claim for compensation. They argue that the Office of Special Masters ruled that a petitioner may be compensated even though medical records do not confirm the exact date of onset in *Veon v. Secretary of HHS*, No. 89–102V, 1990 WL 293378 (Cl.Ct.Spec.Master Sept. 14, 1990), *aff'd* (Cl.Ct. Jan. 9, 1991) (unpubl.). Second, petitioners argue that the special master "does not take into account the fact that Mrs. Tweten was not directly requested to investigate the exact date of the onset of the seizures by anyone until counsel was contacted." Pets' Br. filed July 5, 1991, at 6. Consequently, petitioners stress that the dates noted in the medical records were not as accurate as they would have been if Mrs. Tweten had been more focused on the importance of the date of onset.

a. Petitioners take issue with the special master's emphasis on Dr. Zelaya's deposition and the medical records in contrast to the testimony of Mrs. Tweten. Petitioners rely heavily on *Veon*, arguing that a petitioner can still be compensated even in cases in which medical records do not confirm the date of onset and do not provide an evidentiary basis for rejecting petitioners' testimony. The Act provides that "[t]he special master or court may not make ... a finding [that the petitioner has established entitlement by a preponderance of the evidence and that there is not a preponderance of the evidence that the injury is due to factors unrelated to the administration of a vaccine] based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." 42 U.S.C.A. § 300aa–13(a)(1). However, the Act allows for compensation to be awarded even though the onset of a reaction "was not recorded or was incorrectly recorded as having occurred outside" the critical three-day period. 42 U.S.C.A. § 300aa–13(b)(2). In such instance a peti-

tioner must show "by a preponderance of the evidence that the onset ... described in the petition did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The *Veon* case is fully consistent with the Act. In that case, the mother observed eye movements and jerking spells the day following her minor son's third vaccination. The child was subsequently taken to a doctor where an EEG and neurological examination indicated that he had a seizure disorder and abnormal brain activity. The issue was whether "there ha[d] been successfully established the necessary temporal link between the vaccination and Eric's injuries....," *i.e.*, an onset of injuries within the three-day time period. *Veon*, slip op. at 4. Respondent contended that the medical records in *Veon* did not precisely locate the exact date of the onset of the seizures within three days of a vaccination.

Rejecting respondent's argument that section 300aa–13(a)(1) precluded compensation, the special master reasoned:

[42 U.S.C. § 300aa–13(b)(2)] specifically states that the Program factfinder may find that the first symptom of a Table injury occurred within the requisite time period 'even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period.' Clearly, this latter statutory language specifically contemplates situations in which the symptoms of a vaccine recipient were *not* recorded in medical records as occurring within the Vaccine Injury Table time periods. It specifies that in such situations the factfinder *may* look beyond the medical records, to the testimony of individuals, to determine when the first symptom of a Table injury occurred....

*Veon*, slip op. at 6 (emphasis in original). In addition, the special master in *Veon* noted that "the factfinder obviously must closely scrutinize such eyewitness testimony, and weigh it cautiously against the contradictory medical records...." *Id.* at 6–7 (citation omitted). The special master concluded that petitioner was entitled to

compensation after determining that the medical records strongly indicated that the onset occurred approximately within the three-day period and that the testimony was sufficient to establish that the onset occurred within the applicable period.[1]

█ In the case at bar, the special master based his decision on the medical records, deeming "crucial" Dr. Zelaya's September 10, 1987 history and physical examination report noting that the time connection between the DPT immunization and the onset of seizures "appears to be quite distant." *Tweten*, slip op. at 5. The special master credited as fully consistent with that report Dr. Zelaya's deposition testimony. Dr. Zelaya testified that "[t]he mother was kind of not quite sure; couldn't tell me [the] exact day when those seizures began but she told me it was approximately a month prior to that [August 17, 1987] visit." Deposition of Blas Zelaya, M.D., Apr. 14, 1991, at 15. The special master found that Dr. Zelaya's explanation of the change in the history and physical from "3–3½" to "4" months was credible and consistent with, but not determinative of, petitioners' claim that the seizures began on July 17, within three days of the July 15 second DPT vaccination. The special master then concluded that Dr. Zelaya's testimony, in conjunction with his September 10, 1987 medical record that "[t]he mother also relates the fact that the child received DPT immunization approximately one week prior to the onset of the seizures," supported a finding that the onset of seizures did not occur within the three-day period.

The special master also considered the medical records of Drs. Mattson and Groover. While Dr. Mattson in his letter of August 12, 1987, placed the onset of seizures at the end of July, Dr. Groover's report of January 1988 states Mrs. Tweten noted probable tonic seizures at "approxi-

mately three to four days" after the second DPT. The special master considered the testimony and records of Dr. Zelaya as the most credible because of the contemporaneousness of Dr. Zelaya's examination that specifically sought to determine the relationship of the DPT shot to the seizures.

Mrs. Tweten stated in her affidavit submitted with the petition that the date of onset was July 17. This precise date is supported by a letter to petitioners' counsel from Dr. Mark Thoman dated June 21, 1990. The letter notes the onset date of the seizures as "[b]y Saturday, 7/18/87," but the letter was written at a time remote from the occurrence of the seizures. The special master found unpersuasive a similar report from the Gillette Hospital recording the onset of seizures at about two days after the second DPT shot. The evidence presented to the special master gave varying dates for the onset of the seizures. The special master considered the significant time discrepancies between the doctors' reports and petitioners' claim and determined that a preponderance of the evidence did not support petitioners' claim. The special master could find that there was not a preponderance of the evidence that Christopher suffered his first seizure within three days of his second DPT vaccination on July 15, 1987. *Cf. Bunting v. Secretary of HHS*, 931 F.2d 867, 873 (Fed. Cir.1991) (petitioners' testimony and medical evidence deemed consistent).

b. Mrs. Tweten testified that she told Dr. Zelaya that Christopher's seizures began "within a day or two" after the DPT vaccine was administered.[2] *Tweten*, No. 90–549V, Transcript of Proceedings at 17 (Cl.Ct.Spec.Master Mar. 15, 1991). She also testified that she told Dr. Mattson that the seizures began on July 16 or 17 and that she told Dr. Groover that the seizures began two days after the vaccination, not three or four. She explained that her rec-

---

1. 42 U.S.C.A. § 300aa–13(b)(2) establishes that theoretically the special master is not bound by the available medical records. However, oral testimony that conflicts with contemporaneous documentary evidence will not be accorded weight equal to or greater than the records. *See United States v. United States Gypsum Co.*, 333 U.S. 364, 396, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *Montgomery Coca–Cola Bottling Co. v.*

*United States*, 222 Ct.Cl. 356, 375, 615 F.2d 1318, 1328 (1980).

2. This answer was given in response to a leading question by petitioners' counsel. Although the Federal Rules of Evidence do not apply, she did give other testimony without prompting that the onset was July 16 or 17.

ollection of these events was clearer now, roughly four years after they transpired, than it was during the doctors' visits that were prompted by Christopher's seizures. Petitioners argue that Mrs. Tweten was not pressed to investigate the exact date of the onset, rather than an approximate date, until much after July 1987. This argument supplies one explanation for Mrs. Tweten's wavering testimony, and the special master implicitly rejected it by deeming her testimony not believable in the circumstances. He gave a reasonable explanation for this finding.

Credibility findings are by nature impressionistic. The one sacrosanct province of the factfinder is the ability to assess live testimony. *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 856, 102 S.Ct. 2182, 2189, 72 L.Ed.2d 606 (1982) ("Determining the weight and credibility of the evidence is the special province of the trier of fact...."); *accord Hambsch v. Department of Treasury*, 796 F.2d 430, 436 (Fed.Cir.1986); *Hagmeyer v. Department of Treasury*, 757 F.2d 1281, 1284 (Fed.Cir.1985). Credibility findings should not be disturbed on review unless other evidence or circumstances should not be disturbed on review unless other evidence or circumstances show them to be suspect. In this case the special master took Mrs. Tweten's testimony via a telephone conference call. Although not as valid as an in-person assessment in open court would have been, the special master was in a better position to consider the force and effect of her telephonic testimony than is the reviewing court upon the cold transcript. The court concludes that upon the record as a whole the special master's findings were not arbitrary or capricious.

## CONCLUSION

Accordingly, based on the foregoing, the decision of the special master is sustained and the Clerk of the Court shall enter judgment accordingly.

No costs on review.