Maurine E. KAMINSKI, now known as Maurine Sweet, Administrator of the Estate and heir at law of Christina Kaminski, deceased, Petitioner,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent.

No. 91–652 V.

United States Court of Federal Claims.

Oct. 27, 1997.

William P. Ronan, III, Overland Park, KS, for petitioner.

Mark Raby, U.S. Department of Justice, Washington, DC, for respondent.

## OPINION

WIESE, Judge.

### Introduction

Respondent, the Secretary of Health and Human Services, sues here to set aside a decision of the Office of Special Masters awarding compensation under the National Childhood Vaccine Injury Act of 1986, Pub.L. No.99–660, 100 Stat. 3755 (codified as amended at 42 U.S.C. §§ 300aa–1 to 300aa–34 (1994 & Supp. I 1995)) ("Vaccine Act") to Maurine Kaminski (now Maurine Sweet), the mother and legal representative of the deceased child Christina Kaminski. The case is now before the court on respondent's motion for review. Two issues are raised: first, whether the special master's decision, when evaluated in light of all the evidence, adequately explains the basis for its conclusion; and second, whether the special master erred in denying respondent's motion to reopen proceedings to hear an additional fact witness. The parties have filed written briefs and oral argument was heard on September 24, 1997. For the reasons set forth below, we grant respondent's motion for review. Accordingly, we vacate the decision below and remand the

matter to the special master for the conduct of further proceedings.

*Facts*

Christina Kaminski ("Tina") was born on February 1, 1971, and received her first DPT shot at the age of one and one-half (1½) months. Although her mother ("Mrs. Kaminski") testified that the infant grew irritable as a result of the shot, Tina apparently suffered no other adverse consequences. Tina received a second DPT vaccine on the morning of April 24, 1971. Following the second shot, Mrs. Kaminski described Tina's leg as swollen and her mood as increasingly irritable.

Tina and her mother then spent the evening at the home of Tina's maternal grandmother, some thirty to forty miles away. According to petitioner's testimony, the visit lasted from approximately 4:00 p.m. until 11:00 p.m., during which time the infant refused to be fed and cried inconsolably. The screaming persisted for four to five hours without abatement until the normally alert infant became stuporous, then somnolent. Usually an avid eater, Tina uncharacteristically slept through the night without being fed.

Mrs. Kaminski testified that Tina did not awaken as usual the following morning, but instead had to be forcibly awakened. The infant showed no interest in food and vomited what little food she was fed. However, the crying of the previous evening had ceased, and Tina, now increasingly unresponsive and difficult to arouse, slept most of the day.

On the evening of April 25, 1971, Tina was left in the care of Erma Stewart, a babysitter who had never before cared for Tina, but who had raised five children of her own. Aware that Tina had not eaten all day, Mrs. Stewart attempted to awaken the infant but was unsuccessful in her attempts to feed her. Mrs. Stewart described the infant as very listless, limp, and nonresponsive.

At 11:00 p.m. that evening, a concerned Mrs. Kaminski again attempted to feed her daughter but testified that the milk merely ran down the sides of Tina's mouth as though the infant were drugged. Mrs. Kaminski put Tina to bed, where she found her early the next morning, face down and not breathing. Tina was taken in cardiopulmonary arrest to Bethany Medical Center where she was pronounced dead. The hospital records indicate that there was no history of previous illness. Although the autopsy results were inconclusive, the cause of death listed on the death certificate was "Crib Death."

Mrs. Kaminski filed her claim under the Vaccine Act on January 31, 1991. A hearing was convened on October 1, 1996, to take the testimony of Maurine and Charles Kaminski (Tina's parents), Erma Stewart (the babysitter), Dr. Alan Roth, the pathologist who performed the autopsy, and Drs. David Hirsch and Raoul Wientzen, the parties' expert witnesses. During the hearing, respondent was alerted, for the first time, to the existence of another potential witness—Charles Kaminski's sister Phyllis (now Phyllis Gonzales)—who was living in the Kaminski home at the time of Tina's death. Although the parties disagree as to the date on which petitioner provided information regarding Ms. Gonzales' whereabouts, it is clear that respondent was not able to interview her until March 25, 1997, some five months after the close of the hearing on entitlement. Thereafter, respondent moved to reopen proceedings to allow the introduction of Ms. Gonzales' testimony. The motion, however, was denied. That denial, as we have indicated, presents one of the two issues the court is asked to address on this appeal.

1. **The Adequacy of the Special Master's Findings**

Respondent objects to the special master's decision on the grounds that it was based on incomplete testimony and that it failed adequately to explain the basis for the conclusion that it reached. These two issues—while distinct—each speak to the substantive integrity of the special master's decision. Although respondent focuses first on the omission of Ms. Gonzales' testimony, we begin our discussion instead with the more general inquiry into the adequacy of the special master's findings and the reasoning that was offered in support of the judgment entered.

■ The basic responsibility of a trial court is to enter factual findings on the core issues of the dispute and to articulate a reasoned basis for the judgment entered. *Alpha Distributing Co. of California, Inc. v. Jack Daniel Distillery, Lem Motlow, Prop., Inc.*, 454 F.2d 442, 453 (9th Cir.1972) (requiring findings of fact to be explicit enough to "give the appellate court a clear understanding of the basis of the trial court's decision, and to enable it to determine the ground on which the trial court reached its decision"). Enough must be said to inform a reviewing court of the substance of the problem presented and how it was resolved. In addition—and perhaps most importantly—the analysis must cover the contested issues in "clear, definite and concise language." *Featherstone v. Barash*, 345 F.2d 246, 250 (10th Cir.1965).

Central to the present case is the question of whether Christina Kaminski—a child whose death followed less than 48 hours after her receipt of a DPT vaccination—ultimately died of shock collapse, a condition listed as a compensable table injury under 42 U.S.C. § 300aa–14. In the presentation of the evidence on this issue, petitioner provided testimony from the infant's parents and the infant's babysitter, each of whom described physical symptoms indicative of a sick child. Additionally, petitioner offered the expert opinion of Dr. David Hirsch, a specialist in pediatric disabilities and chronic illnesses, who concluded, on the basis of the clinical descriptions provided by the fact witnesses, that Tina had suffered a shock collapse and that her death was the result of that collapse. Dr. Hirsch found confirmation of his diagnosis in the hypoplasia (shrinkage) of the adrenal glands that was noted in the autopsy report.

Respondent, in turn, relied on the expert testimony of Dr. Raoul Wientzen, Chief of the Division of Pediatric Infectious Diseases at the Georgetown University Medical Center in Washington, D.C. Dr. Wientzen testified that Tina had not suffered a shock-collapse. In forming this opinion, Dr. Wientzen took into account the following considerations: (i) shock reactions almost always occur (if at all) within ten to twelve hours of a DPT shot, (ii) shock-collapse seldom if ever leads to death, (iii) Tina's contemporaneous hospital records make no mention of an illness preceding her death, (iv) the medical findings recorded in the pathology report—specifically, the noted absence of any damage to the organs and, simultaneously, the existence of an enlarged thymus—are inconsistent with a death caused by prolonged shock, and (v) Tina's ability to move her head on the evening of her death was indicative of a physical capacity that would have been precluded if shock-collapse had occurred. Also noted by Dr. Wientzen was the absence from the parents' testimony of any described change in Tina's coloring, as well as the absence from the record of any sign of respiratory distress—two conditions that would have presented themselves in the final hours preceding a death from shock collapse.

In addition to the opinion of Dr. Wientzen, respondent also offered the testimony of Dr. Alan Roth, the pathologist who had performed the autopsy. Dr. Roth testified that the infant did not appear to have suffered from dehydration, a condition likely to have been revealed through the autopsy examination if events had actually transpired as the mother described them.

In assessing these competing lines of testimony, the special master undertook to resolve the question of causation in the following fashion:

To prevail in a death case, petitioner has an affirmative burden to establish an antecedent Table injury and to prove that death was linked to the injury. In and of itself, even if it occurs within the statutory 72 hour time frame, death is not considered a Table injury. The standard of proof, however, is an accommodating one; if petitioner was required to prove cause of death by a standard of scientific certainty, it is unlikely that any petitioner could prevail. Congress clearly did not intend such outcome. The case of *Allen v. HHS*, 24 Cl.Ct. 295 (1991) provides that causation may be implied if the evidence shows an uninterrupted downward course from vaccination through HHE or shock collapse to death. In such a case, if the evidence is

not ephemeral, the court may conclude that death is causally related.

*Allen* is applicable here. First, the court found the factual testimony to be consistent, credible, and convincing. Mrs. Erma Stewart, Tina's baby sitter, corroborated in every respect the clinical symptoms that Tina's mother and father independently described. Her demeanor and her responses ring true and suggest reliability. Second, the court found the basis for Dr. Hirsch's opinion to be more in keeping with in the facts, more soundly reasoned than the position respondent proposes, and more consistent with expert testimony heard in countless other cases with similar circumstances. Dr. Wientzen dismisses too cavalierly the ominous nature of symptoms that led rapidly to collapse and death. He did not convince the court that Tina was a well child during the brief interval between her DPT shot and her abrupt death. . . .

The court finds that Tina's course progressed from excessive, inconsolable screaming, unusual somnolence, reduced awareness with difficulty in being aroused, floppiness (as Erma Stewart describes it, "like handling a little rag doll") (Tr. at 108), failure to respond to her caregivers or her environment, inability to feed in her normal fashion, and death. The court accepts as reliable Dr. Hirsch's opinion that these symptoms are sufficiently severe to qualify as a Table injury, namely HHE and/or shock collapse.

*Kaminski v. Secretary of the Dep't of Health and Human Servs.*, No. 91–0652V, slip op. at 3 (Fed. Cl. Sp. Mstr. June 13, 1997).

■ The question raised here is whether the foregoing analysis adequately addresses the issues in the case and offers a sufficient explanation in support of the decision reached. Respondent argues essentially that the decision comes to its conclusion without focusing on all the critical evidence and therefore cannot be accepted as a fair resolution of the problem presented. We agree.

Notably absent from the special master's opinion are any findings concerning the autopsy evidence and any evaluative discussion of that evidence. That evidence, however, cannot be ignored; it was central to respondent's position. Indeed, it provided the core factual support for Dr. Wientzen's expert opinion to the effect that the absence of a withered thymus and the absence of tubular necrosis in the kidneys presented physical conditions that, as a matter of medical science, could not be reconciled with a finding of death due to shock collapse. Even if the special master considered this medical opinion to be unpersuasive—and that, quite clearly, was the judgment reached—still one needs to know the analysis that led to that negative evaluation. For example, it is unclear by what line of reasoning the special master could accept Dr. Hirsch's opinion asserting that the smaller-than-normal adrenal glands evidenced a death due to shock collapse—a diagnostic correlation acknowledged to be without independent support in contemporaneous medical literature—and, at the same, ignore the tell-tale absence of any damage to the kidneys—a contradiction in pathological data brought home by Dr. Wientzen's unchallenged assertion that the "kidneys are always involved in shock."

Along with the absence of any findings and discussion regarding the autopsy data, there also seems to be present in the special master's decision a singular emphasis on the lay testimony as offering the exclusive source for "the facts" of the case. We have in mind, for example, the special master's statement describing Dr. Hirsch's opinion "to be more in keeping with the facts"—a statement that, it seems to us, could only be accepted as correct if the lay testimony alone were to serve as the factual foundation against which to assess the nature of Tina's injury and the cause of her death. The court cannot go along with this orientation to the issues confronting the special master.

The Vaccine Act anticipates—indeed, even requires—that lay testimony be supported by medical records and opinions in order to provide a more comprehensive and more reliable account of a vaccine claimant's medical condition. Autopsy reports are, therefore, as much a part of "the facts" of a case as the oral testimony offered by the lay witnesses.

Thus, the issue confronting the special master was not whether Dr. Hirsch's opinion

fit better with the facts offered by the lay witnesses. That speaks to only half of the story, and the lesser half at that. Rather, the real issue is whether, taking all the facts into account, *including the autopsy report— and the medical findings justifiably deducible therefrom*—one could say with the requisite degree of medical certainty that Tina suffered a shock collapse that led to her death.

Ruling case law instructs that a decision which "entirely fail[s] to consider an important aspect of the problem" is arbitrary and capricious and hence not entitled to finality. *Hines v. Secretary of Dep't of Health and Human Servs.*, 940 F.2d 1518, 1527 (Fed.Cir. 1991) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). Because the decision rendered in this case ignores the information set out in the autopsy report and provides no acceptable explanation for doing so, we cannot allow it to stand.

### 2. The Exclusion of Ms. Gonzales' Testimony

The special master denied respondent's request to take additional testimony from Ms. Gonzales on the grounds that the prospective witness' expected testimony (summarized in a declaration that accompanied respondent's motion to reopen) was "speculative, conclusory and immaterial." Although Ms. Gonzales' declaration reveals that she lived with the Kaminski family and saw the child several times in the days before Tina's death, the special master declined to admit her testimony in part because she had not specifically claimed to be an eyewitness during the period in question. The special master further concluded that Ms. Gonzales' proposed testimony did not contradict petitioner's version of events, since petitioner had claimed not that the child was sick, but that she had exhibited increasing irritability and loss of appetite before finally becoming stuporous and somnolent. Ms. Gonzales' observations that "Tina seemed fine before her death," and that she did "not recall Tina being sick in the days before her death," were thus deemed immaterial.

▇ The special master's decision to disallow Ms. Gonzales' testimony, not for its untimeliness (a concern apparently never at issue), but for its expected failure to offer facts that could possibly affect the fact finder's judgment, runs counter to the policy of evidentiary flexibility and informality traditionally observed in proceedings of this sort. 42 U.S.C. § 300aa–12(d)(2), RCFC App. J, Rule 8(b). Nevertheless, departure from this norm of practice would not, in itself, provide sufficient reason to invalidate the special master's ruling. Indeed, even under the more formal standards that guide the receipt of evidence in the federal courts, error cannot be predicated upon a ruling which admits or excludes evidence "unless a substantial right of the party is affected." Fed.R.Evid. 103(a). What is required, therefore, is "an assessment of the likelihood that the error affected the outcome of the case," *Ricketts v. City of Hartford*, 74 F.3d 1397, 1412 (2d Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 65, 136 L.Ed.2d 26 (citing *Jordan v. Medley*, 711 F.2d 211, 218 (D.C.Cir.1983) (Scalia, J.), *United States ex rel. D'Agostino Excavators, Inc. v. Heyward–Robinson Co.*, 430 F.2d 1077, 1083 (2d Cir.1970), *cert. denied*, 400 U.S. 1021, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971)) or an assessment of the likelihood that the fact finder's judgment in some material respect "was swayed by the error." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 150 (2nd Cir.1997). We examine the excluded evidence in light of this standard.

Although the special master may have been correct in questioning the value of such statements as "if Christina had been sick . . . I am almost certain I would have recalled it" and "I just can't imagine them going out and leaving Christina with Erma [the babysitter] if she were sick," the special master erred in dismissing Ms. Gonzales' testimony in its entirety. Ms. Gonzales' declarations were sufficient to establish her presence, if not during the "few crucial hours" referred to by the special master, then certainly during the two-day period preceding Tina's death. First-hand observations of the child's behavior during this 48–hour period are directly relevant to the question of whether a table injury as defined by the Vaccine Act in fact occurred,

and Ms. Gonzales was arguably in a position to offer a significantly different perspective on the events in question.

The court does not mean to suggest, however, that the probative value of Ms. Gonzales' proposed testimony is to be judged solely by its potential to contradict the testimony given by petitioner. To the contrary, Ms. Gonzales' observations would have importance here even if they simply offered a less dramatic—but equally believable—account of Tina's post-vaccinal condition. For even a slightly more sanguine interpretation of Tina's clinical behavior than that deducible from petitioner's testimony might have led to a different pathological conclusion.

Central to the government's case is the assertion that Tina Kaminski did not die of shock collapse. The special master ultimately rejected that conclusion, however, in part because it did not comport with the otherwise consistent factual testimony given by petitioner's witnesses. In addition, the special master accepted Dr. Hirsch's interpretation of that testimony rather than Dr. Wientzen's because the first was "more in keeping with the facts" while the second "dismisses too cavalierly the ominous nature of the symptoms." Yet, if Ms. Gonzales had been allowed to present evidence disputing those symptoms, Dr. Wientzen's skepticism concerning the accuracy of the petitioner may indeed have become well-founded. The testimony of Ms. Gonzales—a witness present in the home who disputed the symptoms petitioner describes—might thus have been instrumental in establishing that no table injury occurred.

Given that both the special master and petitioner's expert relied on clinical descriptions provided by lay witnesses to reach their conclusions about the infant's condition, the exclusion of Ms. Gonzales' testimony necessarily deprived respondent of the opportunity to challenge the fundamental factual assertions on which the case was based. The special master's dependence on the clinical testimony both to determine that a table injury occurred and to discredit respondent's expert witness leads this court to conclude that the fact finder's judgment was swayed in a material respect by the failure to admit the

Gonzales testimony. We are forced, then, to construe that exclusion as an error.

### Conclusion

For the reasons stated herein, the decision entered by the special master in this case is vacated and the case is remanded to the special master for the conduct of further proceedings.