**Jane DOE, Petitioner,**

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent.**

**No. [redacted] V.**

United States Court of Federal Claims.

Filed under seal March 27, 2007.

Reissued April 18, 2007.[1]

---

1. Pursuant to Vaccine Rule 18(b), petitioner has requested that her name be redacted from the published opinion to protect her privacy. The Court has accordingly replaced her name in the caption, text of the opinion, and Special Master's decision with the pseudonym "Jane Doe," and has redacted the case number from the published opinion. With these alterations, and a few typographical adjustments, the opinion is reissued for publication.

Paul S. Dannenberg, Huntington, Vermont, for Petitioner.

Linda S. Renzi, Senior Trial Counsel, Torts Branch, Civil Division, Department of Justice, with whom were Peter D. Keisler, Assistant Attorney General, Timothy P. Garren, Director, Vincent J. Matanoski, Acting Deputy Director, and Gabrielle M. Fielding, Assistant Director, all of Washington, D.C., for Respondent.

## MEMORANDUM OPINION AND ORDER

WOLSKI, Judge.

Petitioner Jane Doe has moved for review of Special Master John F. Edwards's decision denying her compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §§ 300aa–10 *et seq.* ("Vaccine Act" or "Act"), and directing that judgment be entered for respondent, the Secretary of the Department of Health and Human Services. Petitioner claims that a Hepatitis B vaccination ("HBV") caused neutropenia[2] and arthritis, and raises several objections to the Special Master's decision. These objections concern the degree of attention given to the record by the Special Master; the Special Master's determinations regarding the credibility of petitioner and her expert witness; and the amount and nature of the questions posed by the Special Master during the hearing on petitioner's claims. For the reasons below, the Court sustains the Special Master's decision.

## I. BACKGROUND

Petitioner, born on November 28, 1959, received her HBV on April 28, 1998. Pet.'s Ex. 1 at 1–2. She filed her petition for compensation on April 2, 2001, *see* Pet. at 1, claiming that the HBV was followed by her "first and marked problem" with pneumonia in August 1998, "significant knee pain" a few weeks later, then "flu-like symptoms at least once or twice a month" (later diagnosed as "acute pharyngitis with viral syndrome"), and

finally "persistent canker sores" that last "for weeks at a time" and are accompanied by constant sore throats, swollen glands, low-grade fever, and chronic fatigue. *Id.* Ex. 13 ¶¶ 3–4, 6–8. During a January 8, 2002 status conference, petitioner identified her theory of injury as "Hepatitis B vaccine-related auto-immune neutropenia." *See* Sp. Mstr. Order (Jan. 8, 2002).

At her request, petitioner was granted extensions of time in which to compile a record for the Special Master's review and to secure the opinion of a medical expert. *See, e.g.,* Final Enl. Bef. Invol. Dism. (Nov. 27, 2002); Mot. for Ext. (Jan. 5, 2004). While proceeding *pro se,*[3] petitioner initially produced the medical opinion of Professor Boyd E. Haley, Ph.D., which the Special Master rejected on January 23, 2003 as failing to prove actual causation. *See* Sp. Mstr.'s Order to Show Cause (Jan. 23, 2003).[4] After petitioner produced the expert opinion of Harold E. Buttram, M.D., and the government responded, the Special Master rejected Dr. Buttram's report, ruling that it, too, was inadequate. *See* Sp. Mstr.'s Order to Show Cause (July 2, 2003).[5] In January and May 2004, petitioner filed the medical reports of Ariel Distenfeld, M.D. *See* Distenfeld Aff. (Jan. 29, 2004); Pet.'s Ex. D (May 6, 2004). The government responded with the medical report of Gregory H. Reaman, M.D. Resp.'s Ex. A (July 8, 2004).

On October 19, 2005, the Special Master convened a hearing at which petitioner, petitioner's expert, and respondent's expert tes-

---

2. Neutropenia is a hematological disorder defined as "a decrease in the number of neutrophils in the blood." Dorland's Illustrated Medical Dictionary 1260 (30th ed.2003).

3. Petitioner's original counsel withdrew as attorney of record on September 6, 2002. *See* Sp. Mstr.'s Order to Show Cause (July 2, 2003) at 1 n. 2. Her current counsel was substituted in as attorney of record on January 5, 2004.

4. After describing the standards petitioner was required to meet under the Vaccine Act, the Special Master rejected this opinion because Dr. Haley lacked a medical degree and thus could not proffer a "medical opinion," as required by 42 U.S.C. § 300aa–13(a)(1); because the opinion did not support petitioner's theory of HBV-related autoimmune neutropenia; and because Dr.

Haley's conclusory opinion did not address the specific facts of the case and did not appear to be based on a review of all of petitioner's medical records. Sp. Mstr.'s Order to Show Cause (Jan. 23, 2003) at 3.

5. Concerning Dr. Buttram's submission, the Special Master concluded that it, too, failed to "express any rational, supported opinion that advances in any way Ms. [Doe's] 'heavy' burden to prove causation." Sp. Mstr.'s Order to Show Cause (July 2, 2003) at 4. The Special Master agreed with respondent's assessment that Dr. Buttram's statement did not satisfy the actual-causation standard, as it was found to rely solely on a temporal association between the HBV and petitioner's health problems and lacked a scientific explanation and a logical sequence of cause and effect. *See id.*

tified. During her testimony, petitioner was asked by the Special Master to explain three medical records which indicated that the symptoms of injuries and illnesses allegedly caused by the HBV actually predated her immunization. Tr. (Oct. 19, 2005) ("Tr.") at 28–32. On September 1, 1998, she apparently told an orthopedist, Dr. Jonathan Glashow, that her problem with her right knee "ha[d] been going on for about six months." Pet.'s Ex. 7. The notes from a September 3, 1998 appointment with Dr. Avaz of Columbia–Presbyterian Medical Center state that petitioner informed the doctor that she was "in general good health except for last 6 months had episodes of ? sore throat, tactile temp × 2–3 days, fatigue, had episode of pneumonia," right knee pain, and "recurrent cold sores." Pet.'s Ex. 6 at 1. And the notes dated September 9, 1998, from the evaluation of a physical therapist recommended by Dr. Glashow, state that "[approximately] 6 mo[nths] ago [petitioner] noticed minor discomfort in [right] knee." Pet.'s Ex. 12 at 2.

Petitioner contended that her statement to Dr. Glashow was "an estimation," and that she "wasn't really thinking that precisely about the time frame." Tr. at 28. She speculated that the doctor might have posed possible time frames of a week, six months, a year, and two years, and that six months would thus have been "the closest to what I could say." Id.; see also id. at 106–09. Concerning the statement to Dr. Avaz, petitioner claimed not to remember giving a six-month figure, and explained that because she was in such pain and taking "Advil, for the knee," she was "kind of in a daze." Id. at 30. She hypothesized that if she said "six months," she "wasn't thinking of a specific month," but instead used "six months" as an expression of any period of time less than six months. Id. And she testified that she did not recall telling the physical therapist that her knee problem had existed for six months, id. at 31, guessing that she "really didn't think it was important when exactly the symptoms began." Id. at 32.

Petitioner's expert, Dr. Distenfeld, opined that the antibodies created in petitioner's body in response to the HBV could have attacked the neutrophils in her blood, resulting in low counts of white blood cells in general (leukopenia), and of neutrophils in particular (neutropenia). See Tr. at 52–56. Since neutrophils destroy bacteria and viruses, a low neutrophil count leaves the body susceptible to infections. Id. at 60–61. Rather than the range of 1800–6000 neutrophils per microliter of blood, which is considered normal, see Distenfeld Aff. at 2, petitioner's blood tests taken after she received the HBV show abnormally low levels—approximately 960 in late August 1998, 580 in September 1999, and then varying from a low of about 500 in August 2000 to a normal count of 1900 in June 2005. See Tr. at 86–90; see also Pet.'s Ex. 9 at 28; Pet.'s Ex. 8 at 6; Pet.'s Ex. 11 at 20; Pet.'s Ex. L at 2. Doctor Distenfeld testified that petitioner suffered from "multiple infections," including pneumonia, "recurrent pharyngitis, some swelling of lymph nodes, [and] fatigue," beginning three months after receipt of the HBV. Tr. at 51. He posited that neutropenia resulting from an autoimmune reaction to a vaccination would normally take two to four months after the vaccination to develop, and that petitioner's testimony of symptoms occurring three months after receiving the HBV is consistent with this time frame. Id. at 56; see also id. at 99 (explaining neutropenia could occur "as early as two weeks" after the triggering event).

In response to questioning from the Special Master, petitioner's expert conceded that he had not seen records of any complete blood counts performed for petitioner after June 1992, when her neutrophil count of 1980 was "in the lower end of the normal range," id. at 86, and prior to August 1998, and thus could not know whether she had neutropenia during that time period. Id. at 90, 93. He also conceded that the existence of symptoms of infection prior to the date of the HBV "would put some doubt on [his opinion], no question about it." Id. at 94. Doctor Distenfeld also stated that he was basing his opinion on "a history" that was "provided" to him, copies of blood tests and counts, "and some very few, actually, original medical records," the latter being "just very few pages." Id. at 83–84.

Respondent's expert, Dr. Reaman, testified that rather than causing her infections, it was more likely the case that petitioner's diminished neutrophil count in August 1998, on the heels of her pneumonia, was the result of a viral infection. *Id.* at 120. He also explained that bacterial and severe fungal infections—but not viral infections—are "complications of neutropenia." *Id.* at 122. After petitioner was re-called and asked by the Special Master about the "viral syndromes" to which she earlier testified, petitioner explained that she does not distinguish between bacterial and viral when she uses the term "viral," and that she had not been hospitalized "for a severe fungal infection or a severe bacterial infection." Tr. at 166–67.

After the hearing, the parties were given time to supplement the record. On April 13, 2006, petitioner filed a motion for leave to amend her petition to add a claim for significant aggravation. *See* Mot. for Leave to Amend Pet. Petitioner submitted a supplemental affidavit from Dr. Distenfeld. Pet.'s Ex. 32. The expert stated that he had reviewed "additional medical records," and had not changed his opinion in the matter. *Id.* at 1. He explained that "[t]he new records indicate that [petitioner] was in good health prior to the vaccination with the exception of two small canker sores on her inner lip." *Id.* Basing his opinion on the medical clinic records from the day she was given the HBV, he concluded she "was in general good health previous to the vaccination." *Id.* at 2 (citing Pet.'s Ex. 31). He opined that "the vaccination greatly aggravated [petitioner's] previous low normal neutrophil count condition and led to the substantial deterioration of her health including frequent colds, fatigue and a bout of pneumonia and recurring illnesses." *Id.*

The Special Master denied petitioner compensation in an opinion dated September 27, 2006. He based his decision on "four pointed, dispositive issues." *Doe v. Sec'y of HHS,* No. [redacted]V, slip op. at 3 (Sp.Mstr. Sept. 27, 2006). First, he did not find credible the petitioner's explanations of her statements to medical providers, in early September 1998, that her symptoms began six months prior. *Id.* at 5. Based on the medical records reflecting these statements, and the records showing persistent canker sores prior to the April 28, 1998 HBV, the Special Master determined it was more likely than not that petitioner had cold sores and bouts of sore throat, tactile temperature, and fatigue, as well as knee pain, all prior to her Hepatitis B vaccination. *Id.* at 6. Second, the Special Master gave Dr. Distenfeld's opinion "no evidentiary weight," *id.,* due to the expert's admission that he did not review all of petitioner's medical records before forming his opinion, and the expert's assumption, contrary to the Special Master's findings, that petitioner was in good health prior to the vaccination. *Id.* at 7. Thus, the Special Master found that the expert failed to establish that the HBV was the legal cause of petitioner's neutropenia. *Id.* at 8.

Third, with no expert on arthritis testifying in support of her claim, *see* Tr. at 59–60, petitioner's arthritis claim rested on the diagnoses and clinical observations contained in the medical records. While an orthopaedic surgeon treating petitioner noted that she exhibited "possible autoimmune arthritis," Pet.'s Ex. I at 1, a Magnetic Resonance Imaging of her right knee showed "patellofemoral degenerative disease." *Id.* at 2. The Special Master determined that the physician's records "do not express 'a medical theory causally connecting' Ms. [Doe's] April 28, 1998 Hepatitis B vaccination with Ms. [Doe's] arthritis," *Doe,* slip op. at 8 (quoting *Althen v. Sec'y of HHS,* 418 F.3d 1274, 1278 (Fed.Cir.2005)), and explained no association between the HBV, "possible autoimmune arthritis," and the diagnosis of "patellofemoral degenerative disease." *Id.* at 9. The Special Master found that the medical records did not establish, by the preponderance of the evidence, that the HBV caused petitioner's arthritis. *Id.* And fourth, the Special Master found the significant aggravation claim was not proven by petitioner. He noted that petitioner "did not experience any bacterial infections or fungal infections that are common with chronic neutropenia," *id.* at 10 (citing Tr. at 70–71, 161, 166–67), and that petitioner's most recent blood count "showed no evidence of neutropenia." *Id.* (citing Pet.'s Ex. L). Because he had given Dr. Distenfeld's opinion "no evidentiary weight,"

*see id.* at 6, the Special Master concluded that the expert could not be relied upon to prove that the HBV significantly aggravated a preexisting condition. *Id.* at 10.

On October 26, 2006, petitioner filed her motion for review pursuant to Rules 23 and 24 of the Vaccine Rules of the United States Court of Federal Claims ("VR"). She raises three objections to the Special Master's decision. Petitioner contends that the Special Master conducted a "superficial review of the factual record" that deprived her of a full and fair hearing. Mot. for Rev. at 1–2. She challenges the Special Master's determination of her expert's credibility. *Id.* at 2–6. And she argues that "critical evidence" was ignored by the Special Master. *Id.* at 6–14. This third objection encompasses the question of petitioner's credibility, *id.* at 6–10, the alleged existence of evidence in the record supporting the significant aggravation claim, *id.* at 10–11, and a complaint that the Special Master assumed the role of "zealous advocate for the government" by his extensive questioning of petitioner and her expert. *Id.* at 11–14. Petitioner argues that the Special Master's decision should be reversed as arbitrary, capricious, an abuse of discretion, and not in accordance with law. *Id.* at 14–16.

## II.  DISCUSSION

### A.  Legal Standards

#### 1.  *Court's Standard of Review of a Special Master's Decision*

Under the Vaccine Act, the Special Master must award compensation if, "on the record as a whole," he finds "that the petitioner has demonstrated by a preponderance of the evidence" the claims in the petition. 42 U.S.C. § 300aa–13(a)(1)(A).[6]  The Act provides that "[t]he special master or court may not make such a finding based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." *Id.* § 300aa–

13(a)(1). The Special Master must consider all the "relevant medical and scientific evidence contained in the record," including any "diagnosis, conclusion, [or] medical judgment ... regarding the nature, causation, and aggravation of petitioner's illness, disability, injury, condition, or death" and "the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." *Id.* § 300aa–13(b)(1). The Act further specifies that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court." *Id.* The Special Master is entrusted with "evaluating the weight to be afforded to any" of these sources of information. *Id.; see also Bradley v. Sec'y of HHS*, 991 F.2d 1570, 1575 (Fed.Cir.1993) (describing credibility determinations of a special master as "virtually unreviewable" by a reviewing court).

The Special Master's decision may be reviewed by this Court, which may "set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law." 42 U.S.C. § 300aa–12(e)(2)(B). Findings of fact are to be reviewed under the "arbitrary and capricious" standard; legal questions are reviewed *de novo;* and an abuse of discretion standard is used for discretionary rulings. *See Munn v. Sec'y of HHS*, 970 F.2d 863, 870 n. 10 (Fed.Cir.1992). With respect to arbitrary and capricious review, "no uniform definition of this standard has emerged," but it is "a highly deferential standard of review" such that "[i]f the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines v. Sec'y of HHS*, 940 F.2d 1518, 1527–28 (1991).[7]

---

6. By the same preponderant-evidence standard, the Special Master must find that nothing else is responsible for causing the injury. *See* 42 U.S.C. § 300aa–13(a)(1)(B).

7. The Federal Circuit explained that the "not in accordance with law" standard pertains to a "dispute over statutory construction or other le-

gal issues," and that the "abuse of discretion" standard is "ordinarily used where the tribunal under review had a finite range of discretion (e.g. to select a penalty, or to award a specific sum as damages, from within a range of permissible alternatives)." *Hines*, 940 F.2d at 1527 (emphasis omitted).

## 2. Standard of Causation in Vaccine Cases

Causation-in-fact—the basis for the legal entitlement to compensation when a petitioner's injury is either not listed in the Vaccine Injury Table of 42 U.S.C. § 300aa–14 or did not occur within the time period set forth in the Table—must be proven under either one of two formulations adopted by the Federal Circuit. *See Pafford v. Sec'y of HHS*, 451 F.3d 1352, 1355 (Fed.Cir.2006). Under one formulation, the petitioner must establish that the vaccine was both a "but-for" cause of the injury and a substantial factor in causing the injury. *See Shyface v. Sec'y of HHS*, 165 F.3d 1344, 1352 (Fed.Cir.1999). Under the alternative three-part test more recently articulated by the Circuit, the petitioner must prove "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Althen v. Sec'y of HHS*, 418 F.3d 1274, 1278 (Fed.Cir.2005). Under either approach, the petitioner bears the burden of proving causation by preponderant evidence. *See* 42 U.S.C. § 300aa–13(a)(1)(A).

## B. Petitioner's Objections to the Special Master's Decision

As was described above, petitioner raises several objections to the Special Master's decision. These concern the comprehensiveness of the decision; the factual determinations made by the Special Master, including the assessment of witness credibility and the weighing of record evidence; and the active role of the Special Master in questioning witnesses. None of the objections warrants setting aside the Special Master's findings or conclusions.

### 1. The Lack of a "Comprehensive Opinion" Does Not Mean Review was Arbitrary

■ Petitioner's first objection appears to be an over-reaction to two sentences in the decision, and a criticism of its length. The Special Master explained:

The special master engages usually in a thorough, critical, intellectual analysis of the facts, the medical evidence and the medical testimony under the actual causation standard. However, after considering carefully the record as a whole, the special master determines that a comprehensive opinion is not necessary in this case. *Doe*, slip op. at 3 (internal citations omitted). Petitioner, understandably disappointed with the result below, re-characterizes these sentences as an admission of a "cursory examination of the record." Mot. for Rev. at 2. She contends that the Special Master's decision exhibits a "superficial review of the factual record" resulting in "multiple errors," an "incomplete assessment of the medical record," and a "summary dismissal." *Id.* These alleged shortcomings, in turn, are said to reveal violations of the Special Master's obligation to "afford[ ] each party a full and fair opportunity to present its case" and to "govern[ ] by the principles of fundamental fairness to both parties." *Id.* at 2 (quoting VR 3(b), 8(c)).

But in placing special importance on the phrase "a thorough, critical, intellectual analysis" and the word "comprehensive," petitioner ignores other, highly relevant words of the Special Master—that the decision was written "after considering carefully the record as a whole." *Doe*, slip op. at 3. Although the decision might be relatively brief, the level of detail in the discussion section confirms that the Special Master carefully considered the full record in reaching his decision. *See id.* at 3–10. A review of the transcript from the October 19, 2005 hearing also shows that the Special Master was very well-acquainted with the medical records submitted by petitioner—indeed, that is one of petitioner's objections to the proceeding below. *See* Mot. for Rev. at 11–14.

All it appears the Special Master meant by stating that "a comprehensive opinion is not necessary" was that the "four pointed, dispositive issues" he identified obviated the need to discuss such matters as the plausibility of petitioner's medical theory that HBV can cause neutropenia. *See Doe*, slip op. at 3. If he is right, then the absence of a

"thorough, critical, intellectual analysis" of these matters is irrelevant. There is no requirement that decisions of the Special Master be more thorough and comprehensive than necessary to decide the merits of a petition. Rather, the Special Master must "consider[ ] the relevant evidence, draw[ ] plausible inferences and articulate[ ] a rational basis for the decision." *Hines*, 940 F.2d at 1528. To determine whether this obligation was met, the Court turns to petitioner's substantive objections.

### 2. The Determination of Expert Credibility

■ The Special Master, "given circumstances that are peculiar to this case," made the determination to "accord[ ] Dr. Distenfeld's opinion no evidentiary weight." *Doe*, slip. op at 6. This determination rested primarily on two grounds. First, Dr. Distenfeld testified that he had formed his opinion after having seen "very few pages" of petitioner's "original medical records," and based it instead on a "history" that was given to him. Tr. at 83–84; *see Doe*, slip op. at 6–7. Second, Dr. Distenfeld, on the basis of the information he did review, assumed that petitioner did not suffer from any symptoms of infection prior to receiving the HBV on April 28, 1998. *See* Tr. at 91–92; *see also Doe*, slip op. at 7. But the Special Master had determined, based on petitioner's medical records, that several symptoms pre-dated the receipt of the HBV. *See Doe*, slip op. at 6. During the hearing, when these records were brought to Dr. Distenfeld's attention, he acknowledged that such a finding would unquestionably "put some doubt on" his opinion that the HBV caused petitioner's neutropenia. Tr. 94. The Special Master concluded "without doubt that Dr. Distenfeld did not formulate his opinion upon an independent, objective appraisal of Ms. [Doe's] medical history developed through his thorough review of Ms. [Doe's] medical records." *Doe*, slip op. at 7.

Petitioner objects to this credibility determination. She argues that it is based on just "one question and one answer during the heat of the hearing," when Dr. Distenfeld, who "is not a professional witness," "appar-

ently forgot what records he reviewed" when confronted by "intense questioning." Mot. for Rev. at 3. To support her contention that Dr. Distenfeld reviewed her complete medical record, petitioner cites various statements of the expert. *See id.* at 3–6. In his initial affidavit, he stated he had "examined [Jane Doe's] medical records by various physicians and providers, dating from 1992 through the present." Distenfeld Aff. at 1. In a later addendum, he stated that, "reflected in [petitioner's] medical records" was evidence of "recurrent infections":

> She did in fact develop[ ] an infection at the beginning of August, 3 months after the vaccination. She was treated for pneumonia with weakness, fatigue, and difficulty in breathing and fever. This illness continued for the entire month of August with on going fatigue, dizziness, cough and intermittent fever.

Pet.'s Ex. D at 1. After the hearing, Dr. Distenfeld submitted a supplemental affidavit that referenced "additional medical records," including respondent's Exhibit E and petitioner's Exhibits 30 and 31. *See* Pet.'s Ex. 32. And during the hearing, the expert testified as to aspects of petitioner's medical history, such as her August 1998 bout of pneumonia and the results of blood counts. *See, e.g.*, Tr. at 67–73.

A special master's "assessments of the credibility of the witnesses" have been described by the Federal Circuit as "virtually unchallengeable on appeal." *Lampe v. Sec'y of HHS*, 219 F.3d 1357, 1362 (Fed.Cir.2000). This deference rests on the special master's "broad discretion in determining credibility because he saw the witnesses and heard the testimony." *Bradley*, 991 F.2d at 1575; *see also Hodges v. Sec'y of HHS*, 9 F.3d 958, 961 (Fed.Cir.1993) (explaining that our Court "is not to second guess the Special Masters['] fact-intensive conclusions" under the "uniquely deferential" standard of review in Vaccine Act cases). Petitioner has not identified any reason to disturb the Special Master's assessment of her expert's credibility. In none of the documents submitted by the expert did Dr. Distenfeld provide an entire list of the medical records he examined. *See* Distenfeld Aff.; Pet.'s Ex. D; Pet.'s Ex. 32.

While review of a transcript is no perfect substitute for the observation of a witness's testimony—one of the strong reasons militating in favor of deference to the credibility determinations of special masters, *see Bradley,* 991 F.2d at 1575—such review does not give the impression that the expert misspoke when he admitted he had seen "very few pages" of petitioner's "original medical records," and had reviewed a "history" given to him. Tr. at 83–84. Nor was there anything about the questioning that would induce memory difficulties. *See id.*

Doctor Distenfeld testified that his opinion rested on the assumption, based on petitioner's earlier testimony at the hearing, that petitioner had no medical problems before receiving the HBV. *See* Tr. at 91–92. When asked if he had reviewed petitioner's Exhibit 6, the medical records from the September 3, 1998 appointment with Dr. Avaz, Dr. Distenfeld responded, "I think I did, but I don't have an immediate recollection of it." Tr. at 93. These records were the basis of the Special Master's determination that several symptoms of infection were experienced prior to the administration of the HBV. *See Doe,* slip op. at 4–6. Asked about this recitation of petitioner's medical history, the expert answered, "I think I would have to really see if this is correct, if the history is correct, but if it is correct, I might have to assume that [petitioner] had some symptoms prior to the vaccination." Tr. at 94. As the Special Master observed, Dr. Distenfeld failed to address the September 3, 1998 notes of Dr. Avaz in his supplemental affidavit submitted after the hearing. *Doe,* slip op. at 7–8; *see* Pet.'s Ex. 32. The expert ignored that recitation of petitioner's medical history, and instead rendered the opinion that petitioner "was in general good health previous to the vaccination," based on the records from the medical clinic the day she was given the HBV—which only noted "two small canker sores on her inner lip." Pet.'s Ex. 32 at 1–2. He thus ignored evidence the Special Master found "highly probative" under "Federal Circuit precedent." *Doe,* slip op. at 8.

The Special Master, having heard Dr. Distenfeld's testimony and having reviewed the record, concluded that the expert's opinion

was not fully informed by the evidence and was not credible. *See id.* at 6–8. These findings are amply supported by the record and will not be set aside. *See Lampe,* 219 F.3d at 1361–62 (accepting special master's weighing of evidence and his determination that experts who relied on evidence rejected by him were not persuasive).

### 3. The Record Supports the Special Master's Decision

Petitioner's third objection is that the Special Master's decision "[i]gnores [c]ritical [e]vidence." Mot. for Rev. at 6. Under this objection, petitioner primarily discusses the determination of her credibility, *see id.* at 6–10, but also discusses the evidence of significant aggravation and the Special Master's active role at the hearing. *See id.* at 10–14.

#### a. The determination of petitioner's credibility.

The Special Master identified three medical records from early September 1998, which indicated that petitioner had told medical providers that symptoms she now attributes to her receipt of the HBV actually dated back six months—eight weeks, that is, prior to the vaccination. *Doe,* slip op. at 4–6. The Special Master gave petitioner the opportunity to explain these discrepancies during the hearing, *see* Tr. at 28–32, and found her explanations lacking in credibility. *Doe,* slip op. at 5. These explanations included speculation that six months was the closest approximation from a list of choices suggested by one doctor, *see* Tr. at 28; that she was "kind of in a *daze*" due to knee pain and Advil, *id.* at 30; that six months to her means "no greater than six months," *id.;* and that she did not think that it was important to give accurate information to a doctor concerning when symptoms of an illness began. *Id.* at 32.

Petitioner disputes the Special Master's interpretation of her medical records. She contends that the pieces of information regarding the onset of her knee pain were "clearly approximations." Mot. for Rev. at 7. But although one record states that her knee "[p]roblem has been going on for about six months," Pet.'s Ex. 7, and the other uses the

symbol for "approximately" to modify her statement of minor discomfort noticed six months prior, see Pet.'s Ex. 12 at 2, it is doubtful that an individual would use "six months" as an approximation regarding a symptom that began just three months prior. See Tr. at 106–07 (petitioner testifying that knee discomfort began "probably, around June or so").

Regarding the records from Dr. Avaz, see Pet's Ex. 6 at 1–2, petitioner argues that the note stating she was "in general good health except for last 6 months" should be read to mean that only the "recurrent cold sores" dated back that far. Mot. for Rev. at 7–9. She cites the clinic record from the date of her vaccination to support this interpretation, as that record noted only mouth sores as a current medical complaint. Id. at 8; see Pet.'s Ex. 31. According to petitioner, "[t]his record is dispositive of the time conflict issue." Mot. for Rev. at 8. But this interpretation does not easily mesh with the actual notes written by Dr. Avaz, which stated that petitioner "for last 6 months had episodes of ? sore throat, tactile temp × 2–3 days, fatigue, had episode of pneumonia 8/98 treated with PCN × 10 days," then described her treatment for knee pain, and added: "Also [symptoms of] recurrent cold sores." Pet.'s Ex. 6 at 1; see also Mot. for Rev. at 7. Thus, the reference to the "recurrent cold sores" is added with an "also," and is separated from the other symptoms by the description of two discrete events—petitioner's pneumonia and her visit to a sports doctor for her knee pain. The notes cannot be naturally read so that the six months time period is based on the cold sores that are "[a]lso" added to the notes at the end of that paragraph. The Special Master's interpretation of these notes as indicating that the symptoms of a sore throat, tactile temperature, and fatigue were the "episodes" occurring for the "last 6

months" is certainly a more plausible and natural reading of the notes.[8]

The Special Master was correct to observe case law that favors contemporaneous medical records over oral testimony, especially when the former contradicts the latter. See Doe, slip op. at 4–5. Thus he was not arbitrary or capricious in adhering to well-grounded law:

> [T]he Supreme Court counsels that oral testimony in conflict with contemporaneous documentary evidence deserves little weight. [The Federal Circuit's] predecessor adopted the same principle. . . .
>
> Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events.

Cucuras v. Sec'y of HHS, 993 F.2d 1525, 1528 (Fed.Cir.1993) (citing United States v. United States Gypsum Co., 333 U.S. 364, 396, 68 S.Ct. 525, 92 L.Ed. 746 (1947); Montgomery Coca–Cola Bottling Co. v. United States, 222 Ct.Cl. 356, 375, 615 F.2d 1318 (1980)). Petitioner's contemporaneous medical records show that in early September 1998, for the purpose of receiving medical treatment, she told medical providers that her knee pain and some of her symptoms of infection had been in existence for roughly six months. She explained that "six months" was an approximation for time periods of three months concerning her knee pain, and one month concerning the other symptoms. The Special Master found these explanations to be incredible. Doe, slip op. at 5. Based on the record, the Court cannot disagree. And given the Special Master's "broad discretion in determining credibility," which makes

---

8. To support her contention regarding the "six month" period, petitioner also notes that the records from a February 1998 appointment with her gynecologist did not contain any reference to symptoms of infection. Mot. for Rev. at 9 (citing Pet.'s Ex. 2 at 2–3 & Pet.'s Ex. E). But the Court does not see how a doctor's records from February 1998 would be evidence that certain symptoms did not arise in March 1998 (that is, six

months prior to early September 1998). The Court also notes that petitioner testified regarding viral syndromes and upper respiratory problems that "a lot of times [she] would be sick and [she] would not go to the doctor," Tr. at 166—which would explain why the symptoms developed as early as March 1998 were not reflected in records of that vintage.

such judgments "virtually unreviewable," the Court must uphold the Special Master's determination. *Bradley,* 991 F.2d at 1575; *see also Hodges,* 9 F.3d at 961.

### b. The significant aggravation claim.

■ Just shy of six months after her hearing, petitioner moved for leave to amend her petition to add a significant aggravation count. *See* Mot. for Leave to Amend Pet. (April 13, 2006). This count was supported by the opinion of Dr. Distenfeld, who submitted a supplemental affidavit which touched on the issue. *See* Pet.'s Ex. 32 at 2. In this supplemental affidavit, Dr. Distenfeld denied that petitioner suffered from any pre-vaccination symptoms of infection. He stated that petitioner's only medical problem as of the date of receiving the HBV was "two small canker sores," which he explained to be "a common occurrence much like the common cold" and to be of unknown origin. *Id.* at 1. He opined that "the vaccination greatly aggravated [petitioner's] previous low normal neutrophil count condition and led to the substantial deterioration of her health including frequent colds, fatigue and a bout of pneumonia and recurring illnesses." *Id.* at 2. Doctor Distenfeld had previously opined that "the vaccine dramatically aggravated a low normal neutrophil count in [petitioner's] case." Pet.'s Ex. D at 1.

For the reasons explained above, the Special Master "d[id] not credit Dr. Distenfeld's opinion." *Doe,* slip op. at 10. Thus, he determined that petitioner had failed to prove that the vaccine actually caused a significant aggravation in her condition. *See id.* And for the same reasons already stated, the Court cannot reverse this credibility determination. Doctor Distenfeld doggedly stuck to his assumption that petitioner suffered no symptoms of infection prior to the vaccination, even though the medical records stating otherwise were brought to his attention by the Special Master. *See* Tr. at 93–94. It was not arbitrary for the Special Master to conclude that Dr. Distenfeld's opinion was not credible. *See Lampe,* 219 F.3d at 1361–62. And without Dr. Distenfeld's opinion on the matter, proof of causation was absent. *See Althen,* 418 F.3d at 1278.

### c. The Special Master's role at the hearing.

■ Petitioner's final objection is that the Special Master "zealously investigated and prosecuted the case for the government." Mot. for Rev. at 11. Petitioner complains that, by her estimate, the Special Master asked over seventy questions of her expert, in comparison with fewer than sixty posed by counsel for the respondent, and asked fifty-eight questions of her, compared to just twenty from respondent's counsel. *Id.* at 11–12. According to petitioner, the Special Master's active involvement in the hearing was contrary to "the traditional role of a judge in a civil matter," violated "the explicit intent of the vaccine act as being a less adversarial forum than civil litigation," and "impermissibly increas[ed] [petitioner's] burden of persuasion." *Id.* at 12.

Petitioner's objection in this regard appears to stem from a misunderstanding of the role of the Special Master. The Vaccine Act authorizes the Special Master to "require such evidence as may be reasonable and necessary." 42 U.S.C. § 300aa–12(d)(3)(B)(i). The Act also provides that "[t]here may be no discovery in a proceeding on a petition other than the discovery required by the special master." *Id.* 300aa–12(d)(3)(B). Additionally, the Act provides that the special masters shall promulgate their own rules, which must "provide for limitations on discovery and allow the special masters to replace the usual rules of discovery in civil actions in the United States Court of Federal Claims." *Id.* 300aa–12(2)(E). As a result, while conducting proceedings expeditiously, flexibly, and in a less adversarial manner, a special master may "requir[e] such evidence as may be appropriate[ ] in order to prepare a decision[ ] including findings of act and conclusions of law." VR 3(b). The special master has the prerogative to "question a witness," and may do so without being "bound by common law or statutory rules of evidence." *Id.* 8(b), (c).

Thus, instead of being passive recipients of information, such as jurors, special masters are given an active role in determining the facts relevant to Vaccine Act petitions. One

reason that proceedings are more expeditious in the hands of special masters is that the special masters have the expertise and experience to know the type of information that is most probative of a claim. Under the procedural framework erected for Vaccine Act cases, the Federal Circuit has noted that "the permissible scope of the special master's inquiry is virtually unlimited." *Whitecotton v. Sec'y of HHS,* 81 F.3d 1099, 1108 (Fed.Cir. 1996); *see also Munn,* 970 F.2d at 871 (describing Congress' designation of the special master as that of an "expert" and acknowledging that special masters are entitled to "the special statutory deference in fact-finding normally reserved for specialized agencies").

Petitioner has not identified any questions from the Special Master that exhibit any partisanship or antagonism, and a review of the transcript yields none. Merely because the Special Master, an expert in whose care the ultimate fact determinations are entrusted, asked many questions of witnesses does not mean the Special Master crossed the line between fact-finder and prosecutor; rather, it means he did his job. Petitioner's objection to his role in the hearing is without merit.

## III. CONCLUSION

After reviewing the submissions of the parties, the evidence in the record, the transcript of the hearing, and the decision of the Special Master, for the foregoing reasons the Court concludes that the Special Master did not err in denying compensation to petitioner under the Vaccine Act. The decision of the Special Master is **SUSTAINED.** The petition for review is **DISMISSED** with prejudice. The Clerk of Court is directed to enter judgment for respondent.

**IT IS SO ORDERED.**