NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**HOLLY LASNETSKI,**
*Petitioner-Appellant*

**v.**

**SECRETARY OF HEALTH AND HUMAN SERVICES,**
*Respondent-Appellee*

---

2017-1168

---

Appeal from the United States Court of Federal Claims in No. 1:14-vv-00580-MBH, Judge Marian Blank Horn.

---

Decided: August 9, 2017

---

RANDALL GORDON KNUTSON, Knutson Casey Law Firm, Mankato, MN, for petitioner-appellant.

DEBRA ANN FILTEAU BEGLEY, Vaccine/Torts Branch, Civil Division, United States Department of Justice, Washington, DC, for respondent-appellee. Also represented by CHAD A. READLER, C. SALVATORE D'ALESSIO, CATHARINE E. REEVES, GABRIELLE M. FIELDING.

---

Before LOURIE, REYNA, and HUGHES, *Circuit Judges.*

LOURIE, *Circuit Judge.*

Holly Lasnetski appeals from a decision of the United States Court of Federal Claims ("Claims Court" or "the court") affirming the Special Master's dismissal of her claim for compensation under 42 U.S.C. §§ 300aa-1 to 300aa-34 ("the Vaccine Act"). *See Lasnetski v. Sec'y of Health & Human Servs.*, 128 Fed. Cl. 242, 265 (Fed. Cl. 2016) ("*Claims Court Decision*"); *Lasnetski v. Sec'y Health & Human Servs.*, No. 14-580V, slip op. at *7 (Fed. Cl. Spec. Mstr. April 29, 2016) ("*Special Master Decision*"). For the reasons that follow, we *affirm*.

BACKGROUND

I. Relevant Medical History

Ms. Lasnetski was born on November 30, 1986. In 2008, she sought treatment for a history of headaches, tingling in her left arm, and anxiety. Dr. Raymond Mellema "advised Ms. Lasnetski that she probably belongs at the Crisis Center" for treatment of anxiety and insomnia. *Claims Court Decision*, 128 Fed. Cl. at 245 (internal quotation marks omitted). In 2009, Ms. Lasnetski again sought treatment for headaches, numbness in her face, throat, arms, and hands, and anxiety-related shortness of breath. In April 2009, she was diagnosed with aphthous ulcers, which she "was told was the herpes virus" by Dr. Kristin Wegner. *Id.* (internal quotation marks omitted). In July 2009, Ms. Lasnetski believed that she had suffered a miscarriage because she was feeling "worn down and tired," and Dr. Michael Nicklawsky diagnosed her as having sinusitis, depression and migraine headaches. *Id.* (internal quotation marks omitted). At the end of July 2009, while starting and stopping the medications Topamax, Citalopram, and Augmentin, Ms. Lasnetski suddenly felt numb all over her body, had shortness of breath,

and felt as if she was going to have a panic attack. Dr. Wegner thought the numbness was "probably secondary to anxiety or panic," although he noted that it could have been a reaction to starting and stopping the medications. *Id.* (internal quotation marks omitted).

In February 2011, Ms. Lasnetski presented at an urgent care facility with "urinary frequency and burning," while also complaining of back pain. *Id.* (internal quotation marks omitted). Dr. Mellema assessed a "[p]robable UTI." *Id.* at 246 (internal quotation marks omitted).

On April 3, 2011, Dr. Mellema diagnosed Ms. Lasnetski with "[c]hronic rhinitis" and noted that:

> She gives a history of having been ill a lot this winter and seems to be describing more of [a] progression of viral illnesses rather than one specific thing. . . . She has been on antibiotics multiple times without benefit. . . . [S]he thinks there is some mold in her current living environment.

*Id.* (internal quotation marks omitted).

On July 18, 2011, Ms. Lasnetski received the first dose of a human papillomavirus ("HPV") vaccine at a routine check-up with her primary care physician ("PCP"), Dr. Sara Jorgensen. Eight days later, she visited a chiropractor, complaining of headaches, neck, shoulder, and lower-back pain, and tingling in her left leg. The chiropractor reported that "[Ms. Lasnetski] has a history of a mild strain to her neck about a year ago that was treated by a chiropractor and resolved. She has no other health problems." *Id.* (internal quotation marks omitted). During a visit two days later, she reported that her headache had improved, but she had been having a sharp pain in her lower back the previous night at her job at a liquor store, where she had "to lift heavy cases of bottles." *Id.* (internal quotation marks omitted).

On August, 10, 2011, Ms. Lasnetski went to the emergency room ("ER") because she suspected that she was pregnant, but the pregnancy test was negative and she was diagnosed with vaginal bleeding and cramping. Dr. Jorgensen saw Ms. Lasnetski the next day and noted that she had been "diagnosed with nothing." *Id.* at 247 (internal quotation marks omitted). That visit with Dr. Jorgensen is the first time in the record that Ms. Lasnetski spoke of her symptoms in the context of the vaccine injection. Dr. Jorgensen recorded: "She states she has had a multitude of symptoms since her annual on 7/26/11. She states she started to experience nausea and a stiff neck after her [HPV vaccine] injection. She then developed a migraine that lasted for 4 days." *Id.* (internal quotation marks omitted).

Ms. Lasnetski returned to Dr. Jorgenson on August 11, 2011, citing nausea, stiff neck, increased urination, bloating, constipation, and the problems she previously reported to her chiropractor. The next day, Dr. Gary Kolle—another PCP in the same group as Dr. Jorgensen—diagnosed her with urinary frequency, gastroesophageal reflux disease, leg paresthesias, and a paresthesias-induced headache. Dr. Kolle reported that "Lasnetski has a history of back problems in the past. [Her] neck was stepped on in a mosh pit last year." *Id.* (internal quotation marks omitted).

On August 14, 2011, Ms. Lasnetski visited the ER, claiming that "since she had a vaccination," she suffered an increased frequency of headaches and numbness in her arm, leg, and face. *Special Master Decision*, No. 14-580V, slip op. at 2 (internal quotation marks omitted). An MRI and MRA revealed no abnormalities. The ER physicians diagnosed her with left-side paresthesias and a migraine and instructed her to see a neurologist.

Ms. Lasnetski followed up with a neurologist—Dr. Iris Brossard—on August 22, 2011, who noted that she

claimed to have "virtually every symptom on our [medical history] list" and to "have pain virtually every place." *Id.* (internal quotation marks omitted). A neurological exam revealed no abnormalities, except for mild back tenderness. An antinuclear antibodies ("ANA") test, which looks for an autoimmune reaction, was negative. Dr. Brossard prescribed Ms. Lasnetski two antidepressants and opined that her symptoms were unrelated to the vaccination and more likely due to her chronic migraines and potentially a fibromyalgia syndrome.

The next day, Ms. Lasnetski visited the ER, complaining that her "whole body got tingly." *Id.* at *3 (internal quotation marks omitted). However, most of her symptoms cleared up before she arrived at the ER, so the physicians diagnosed her with numbness of an unknown etiology.

On September 30, 2011, Ms. Lasnetski saw a new PCP, Dr. Sam Camp, to whom she reported that she believed she "had a bad reaction" to the HPV vaccine. *Id.* (internal quotation marks omitted). Dr. Camp's evaluation revealed no abnormalities and he diagnosed constipation-related abdominal pain, irregular menses, a rash, neuralgias, and paresthesias.

Ms. Lasnetski met with a rheumatologist, Dr. Robert Tierney, on December 19, 2011, reporting many of the aforementioned symptoms. The rheumatologist ran numerous tests, which were normal except that they revealed she had a very low level of Vitamin D, which, he explained, could account for her muscle pain and fatigue.

Ms. Lasnetski visited the ER again on January 28, 2012, complaining of "[c]ramping in the abdomen, left upper quadrant abdominal pain . . . and blood and mucus in the stools" along with "ongoing problems with her GI tract." *Claims Court Decision*, 128 Fed. Cl. at 248 (internal quotation marks omitted). The report of the admitting physician, Dr. Mark E. Hoffman, noted that Ms.

Lasnetski had seen a neurologist and a rheumatologist and that, "[g]iven the constellation of other symptoms, apparently she had a positive ANA and a positive rheumatoid factor, but they have not pinpointed a specific autoimmune disorder."  *Id.* (internal quotation marks omitted).  Dr. Hoffman ultimately diagnosed Ms. Lasnetski with a "[c]onstellation of multiple symptoms, not otherwise specified."  *Id.* (internal quotation marks omitted).

On February 2, 2012, Ms. Lasnetski returned to Dr. Camp, complaining of the same symptoms and that she was "quite convinced" that the HPV vaccine caused a systemic autoimmune type disorder.  *Id.* (internal quotation marks omitted).  Dr. Camp speculated that she might have postural orthostatic syndrome ("POTS")—an autonomic nervous system condition characterized by the "inability to tolerate a standing position as a result of a sudden increase in heart rate when rising from a seated or recumbent position"—and, at a follow-up visit in March, noted that she "fixated on her symptoms because of her immunization for HPV."  *Id.* at 249 & n.9.  Ultimately, he reported that fibromyalgia and Vitamin D deficiencies were possible diagnoses and that "autoimmune testing has been negative."  *Id.* (internal quotation marks omitted).

Ms. Lasnetski visited the Mayo Clinic on May 22, 2012 for a full workup under a POTS framework based on Dr. Camp's referral.  She reiterated her symptoms, adding that almost all of them appeared within a month after her vaccination.  Dr. R.D. Fealey concluded that she had neither autoimmune neuropathy nor POTS, but that she could have an "immune-inflammatory tendency" and that, although she had a positive ANA test, she did not have a "really well-defined connective tissue disease."  *Id.* (internal quotation marks omitted).  Dr. Fealey noted that she had "*sensory dyesthesias following HPV vaccination,*" but made no findings as to whether the sensory dyesthesias

was caused by the vaccination. *Id.* at 250 (emphasis added) (internal quotation marks omitted). Another Mayo Clinic physician, Dr. C.J. Michet, asserted that she had an "*idiosyncratic severe reaction to vaccination*" and that "it would probably be prudent in the future for her to be cautious about any further vaccinations." *Id.* (emphasis added) (internal quotation marks omitted). The Mayo Clinic case manager noted that she had a "benign syndrome related to activation of her immune system with perhaps some inflammatory neuritis following her HPV vaccination last July" and a need to be cautious about future vaccinations. *Id.* (internal quotation marks omitted).

For the next year, Ms. Lasnetski sought no medical treatment. Then, in May 2013, she returned to Dr. Camp who found that she still had a Vitamin D deficiency. He reported that Ms. Lasnetski "and her family ha[ve] long felt that her symptoms in her late teens to early 20s [were] a complication of the . . . vaccine," but noted that he was "skeptic[al]." *Id.* (internal quotation marks omitted). Dr. Camp referred Ms. Lasnetski to an infectious disease specialist—Dr. Minces—who observed no abnormalities except for a red rash on her back that increased with anxiety and a Vitamin D deficiency. Dr. Minces did not believe that the vaccination was the underlying cause of her symptoms, but rather believed that they likely resulted from a somatoform disorder—a psychological disorder defined as "the conversion of mental experiences or states into bodily symptoms." *Id.* at n.11 (quoting DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1734). However, Dr. Minces admitted that the vaccine could possibly have triggered a "neuro-immune cascade of complaints." *Special Master Decision*, No. 14-580V, slip op. at *4 (internal quotation marks omitted). Dr. Minces referred Ms. Lasnetski to a psychiatrist, but Ms. Lasnetski refused and "was upset at the suggestion." *Id.*

## II. Procedural History

On July 9, 2014, Ms. Lasnetski filed a petition for compensation under the Vaccine Act, alleging that she incurred "sensory dysesthesias" and a "severe idiosyncratic reaction" due to the HPV vaccine she received on July 18, 2011. *See Special Master Decision*, No. 14-580V, slip op. at *4. A Special Master for the Claims Court dismissed her petition, finding that she failed to allege a "defined and recognized injury." *Id.* at *6 (internal quotation marks omitted). The Special Master credited the testimony of the government's expert, Dr. Thomas Leist, that "sensory dysesthesias" and "severe idiosyncratic reaction" are not *diagnoses* of an injury. Rather, Dr. Leist explained, "sensory dysesthesias" is "merely a symptom or manifestation of an unknown injury" and "severe idiosyncratic reaction" is an "umbrella term which could be used to describe any manifestation of symptoms that post-dates a vaccination." *Id.* (internal quotation marks omitted). Thus, in light of the Vaccine Act's injury requirement, the Special Master dismissed Ms. Lasnetski's claim for failure to allege a "defined and recognized injury." *Id.* (internal quotation marks omitted).

Ms. Lasnetski appealed to the Claims Court, which affirmed the Special Master's dismissal. *See Claims Court Decision*, 128 Fed. Cl. at 265. Before the Claims Court, Ms. Lasnetski argued that the Special Master erred as a matter of law in requiring that she allege a "defined and recognized injury," asserting that such a standard constitutes an "increased burden" over the Vaccine Act's requirement for an "injury," for which any medical "condition" will suffice. *Id.* at 253, 260. Furthermore, Ms. Lasnetski argued that the Special Master abused her discretion in finding that she did not meet that standard because she had been diagnosed by the Mayo Clinic doctors with "sensory dysesthesia" and an "idiosyncratic severe reaction to vaccination." *Id.* at 263. Finally, Ms. Lasnetski argued that the Special Master erred as a

matter of law in terminating her analysis after finding no defined injury and thus not performing an *Althen* analysis for causation-in-fact. *Id.* at 264 (citing *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274 (Fed. Cir. 2005)). The Claims Court affirmed the Special Master, finding no error of law and no abuse of discretion.

First, the court explained that the Special Master's requirement for a "defined and recognized injury" was "quoted directly from the Federal Circuit's decision in *Lombardi*" and thus did not constitute a legally erroneous, heightened burden. *Id.* at 261 (citing *Lombardi v. Sec'y of Health & Human Servs.*, 656 F.3d 1343, 1353 (Fed. Cir. 2011)).

Second, the court found that the Special Master's decision was not arbitrary or capricious in finding that Ms. Lasnetski did not allege a "defined and recognized injury." The court rejected Ms. Lasnetski's argument that "dysesthesia" is a "defined and recognized" medical condition because it is defined in Dorland's Medical Dictionary. The court explained that Dorland's defines 124,000 terms, "including medical procedures, medical instruments, anatomy, symptoms, and chemical compounds," *id.* at 263; thus, simply because Dorland's defines "dysesthesia" does not render it a medical condition rather than merely a symptom or manifestation of an unknown injury, as found by the Special Master. Furthermore, the court pointed to the Special Master's finding that the so-called "diagnoses" made by the Mayo Clinic physicians were made "seemingly without consulting [Ms. Lasnetski's] medical history," a finding, the court noted, that Ms. Lasnetski did not challenge. *Id.* at 264 (internal quotation marks omitted). Thus, the court found that the Special Master was not arbitrary or capricious because she "weigh[ed] the opinions" of the experts and determined that Dr. Leist's opinion was "more credible, when combined with the record before the court." *Id.* The court explained that Ms. Lasnetski "essentially asks this court

to second guess the Special Master's determination," which was not within its purview to do. *Id.*

Finally, the court found that the Special Master's dismissal without performing an *Althen* analysis did not constitute legal error. The court cited our decision in *Lombardi* where we held that finding an actual injury is a pre-requisite to an *Althen* causation analysis. *Id.* at 262 (citing *Lombardi*, 656 F.3d at 1352; *Broekelschen v. Sec'y of Health & Human Servs.*, 618 F.3d 1339, 1349 (Fed. Cir. 2010)). Thus, the court explained, a petitioner must show that she "suffered from any medically recognized 'injury,' not merely a symptom or manifestation of an unknown injury"; if she fails to do so, the analysis stops there and the Special Master is not required to perform an *Althen* causation analysis. *Id.* at 260 (citing *Lombardi*, 656 F.3d at 1353) (internal quotation marks omitted).

Ms. Lasnetski timely appealed. This court has jurisdiction pursuant to 42 U.S.C. § 300aa-12(f).

## DISCUSSION

In Vaccine Act cases, we review a ruling by the Claims Court *de novo*, applying the same standard that it applies in reviewing the decision of the Special Master. *Cloer v. Sec'y of Health & Human Servs.*, 654 F.3d 1322, 1330 (Fed. Cir. 2011) (en banc); *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010). Therefore, we review the rulings of the Special Master to determine whether they were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Munn v. Sec'y of Health & Human Servs.*, 970 F.2d 863, 869 (Fed. Cir. 1992).

Because Ms. Lasnetski's alleged injuries are not listed on the Vaccine Injury Table, 42 U.S.C. § 300aa-14(a), this is an "off-Table" case. *Moberly*, 592 F.3d at 1321–22; *Althen*, 418 F.3d at 1278. As such, Ms. Lasnetski was required to prove, by a preponderance of the evidence,

that the vaccine was "not only a but-for cause of the injury but also a substantial factor in bringing about the injury." *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352 (Fed. Cir. 1999).

On appeal, Ms. Lasnetski challenges the Special Master's determination on the same three grounds that she raised before the Claims Court, namely, that: (1) the Special Master committed legal error in requiring that Ms. Lasnetski allege a "defined and recognized injury," which Ms. Lasnetski asserts constitutes a heightened burden over the Vaccine Act's requirements; (2) even under that standard, Ms. Lasnetski alleged a "defined and recognized injury" and thus the Special Master abused her discretion in finding to the contrary; and (3) the Special Master committed legal error in failing to perform an *Althen* causation analysis. We discuss each issue in turn.

## I. "Defined and recognized injury"

First, Ms. Lasnetski argues that the Special Master erred in requiring her to allege a "defined and recognized injury." Ms. Lasnetski asserts that the Vaccine Act has a broad "injury" requirement—specifically, it defines a "vaccine-related injury or death" as including "an illness, injury, ***condition***, or death." Appellant's Br. 14 (alteration in original) (citing 42 U.S.C. § 300aa-11(c); 42 U.S.C. § 300aa-33(5)). Thus, Ms. Lasnetski argues, any medical "condition" will meet the Vaccine Act's injury-requirement and the Special Master's "defined and recognized injury" requirement was a legally erroneous, narrower requirement that precludes a claimant from recovering for a medical condition simply because it has not yet been given a label. Furthermore, Ms. Lasnetski asserts, the case law broadly refers to a "vaccine-related injury" as a "harm," thus indicating the broad meaning given to that term. *Id.* at 15–16. Furthermore, Ms. Lasnetski maintains, although "defined and recognized injury" is a direct

quote from *Lombardi*, that case is inapposite—it involved a situation where three different experts suggested three different diagnoses that could only result from differing underlying causes, whereas here, Ms. Lasnetski's expert and the Mayo Clinic physicians are in agreement as to her diagnosis.

The government responds that the Special Master properly required Ms. Lasnetski to prove that she had a "defined and recognized injury," in accordance with this court's precedent.

We agree with the government that the Special Master applied the correct standard. In *Lombardi*, we explained that "the statute places the burden on the petitioner to make a showing of *at least one defined and recognized injury*." 656 F.3d at 1353 (emphasis added) (citing 42 U.S.C. § 300aa-11(c)(1)(C)(ii)(I)). Because the Special Master had found that Ms. Lombardi failed "to show by a preponderance of the evidence that she suffered from *any medically recognized 'injury,' not merely a symptom or manifestation of an unknown injury*," we affirmed its finding that she had "failed to meet her burden." *Id.* (emphasis added). Thus, in light of this court's precedent, the Special Master's requirement that Ms. Lasnetski prove a "defined and recognized injury" was not legally erroneous.

## II. The Special Master's finding that Ms. Lasnetski had not met her burden

We next consider whether the Special Master abused her discretion in finding that Ms. Lasnetski had not met her burden to allege a "defined and recognized injury."

Ms. Lasnetski argues that, even under the heightened standard, she sufficiently alleged a "defined and recognized injury." Ms. Lasnetski asserts that she was diagnosed with "dysesthesia," which is *defined* in Dorland's Medical Dictionary and thus is a "defined" medical condi-

tion, as required. Furthermore, Ms. Lasnetski asserts, the condition she alleged is a "recognized injury" because the two Mayo Clinic physicians *recognized* that injury by diagnosing her with "[s]ensory dysesthesia following HPV vaccination" and an "idiosyncratic severe reaction to vaccination." Furthermore, Ms. Lasnetski continues, the Special Master and the Claims Court erred in relying on the medical expert, Dr. Leist, to answer a legal question— i.e., what qualifies as an injury under the Vaccine Act.

The government responds that the Special Master's determination was not arbitrary or capricious. The government contends that the Special Master reviewed the record as a whole and found the opinions of Dr. Leist most persuasive, a fact finding that merits deference on review. Furthermore, the government argues, Ms. Lasnetski was given several opportunities to provide supplemental evidence but declined to do so.

We agree with the government that the Special Master did not abuse her discretion. As the Claims Court found, the Special Master made a well-reasoned determination based on a rational interpretation of the record evidence.

The role of appellate review of a Special Master's decision under the arbitrary and capricious standard "is not to second guess the Special Master's fact-intensive conclusions; the standard of review is uniquely deferential for what is essentially a judicial process." *Locane v. Sec'y of Health & Human Servs.*, 685 F.3d 1375, 1380 (Fed. Cir. 2012) (quoting *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993); *Doe v. Sec'y of Health & Human Servs.*, 601 F.3d 1349, 1355 (Fed. Cir. 2010)). If the Special Master's conclusion is "based on evidence in the record that [is] not wholly implausible, we are compelled to uphold that finding as not being arbitrary and capricious." *Cedillo v. Sec'y of Health & Human Servs.*, 617 F.3d 1328, 1338 (Fed. Cir. 2010) (quoting *Lampe v.*

*Sec'y of Health & Human Servs.*, 219 F.3d 1357, 1360
(Fed. Cir. 2000)).  Put another way, if the Special Master
"has considered the relevant evidence of record, drawn
plausible inferences and articulated a rational basis for
the decision, reversible error will be extremely difficult to
demonstrate." *Hines v. Sec'y of the Dep't of Health &
Human Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991).

In this case, the Special Master drew "plausible infer-
ences" from the record evidence and "articulated a ration-
al basis for [her] decision." *Id.*  Specifically, the Special
Master made a credibility assessment after weighing the
competing evidence from Ms. Lasnetski—i.e., her expert's
report that interpreted the Mayo Clinic physicians' find-
ings as "diagnoses" of cognizable injuries—and testimony
of the government's expert, Dr. Leist, that the so-called
"diagnoses" were not diagnoses at all, but rather a recita-
tion of symptoms of unknown origin.  *See Claims Court
Decision*, 128 Fed. Cl. at 253.  Dr. Leist had testified that
"sensory dysesthesias" is "merely a symptom or manifes-
tation of an unknown injury" and "idiosyncratic severe
reaction to vaccination" is an "umbrella term which could
be used to describe any manifestation of symptoms that
post-dates a vaccination." *Id.*  The Special Master found
Dr. Leist's testimony more credible in light of the record
evidence.

In fact, Dr. Leist had provided a potential explanation
for the divergence between the year of medical evaluation
with no diagnoses of a vaccine-related injury and the so-
called "diagnoses" by the Mayo Clinic physicians and Ms.
Lasnetski's testifying expert.  Dr. Leist observed that
those physicians reached the "diagnoses" "seemingly
without consulting [Ms. Lasnetski's] medical history," but
rather based solely on her report. *Id.* at 252.  Thus, in
light of the record evidence, the Special Master deter-
mined that Dr. Leist's testimony was more credible and
that the so-called "diagnoses" upon which Ms. Lasnetski
based her claim were not cognizable injuries under the

Vaccine Act, but rather merely symptoms of unknown origin.

That conclusion was a reasonable inference drawn from the record evidence. This court does not "reweigh the factual evidence, or . . . assess whether the special master correctly evaluated the evidence. And of course we do not examine the probative value of the evidence or the credibility of the witnesses. These are all matters within the purview of the fact finder." *Munn*, 970 F.2d at 871. Thus, the Special Master's determination was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 300aa-12(e)(2)(B); *see also Hines*, 940 F.2d at 1524.

### III. Failure to perform an *Althen* analysis

We finally consider whether the Special Master erred in not performing an *Althen* analysis for causation-in-fact after determining that Ms. Lasnetski failed to allege a "defined and recognized injury."

Ms. Lasnetski argues that the Special Master was required to perform an *Althen* causation analysis. Ms. Lasnetski asserts that, once a petitioner establishes the three prongs of the *Althen* analysis, the burden shifts to the government to show that the injury was caused by a factor *unrelated* to the vaccine. Thus, Ms. Lasnetski contends, the Special Master improperly avoided the *Althen* analysis and thereby avoided shifting the burden to the government.

The government responds that the Special Master was not required to perform an *Althen* analysis after finding that Ms. Lasnetski suffered no vaccine-related injury.

We agree with the government that the Special Master was not required to perform an *Althen* analysis here. In *Lombardi*, we held that "identification of a petitioner's injury is a *prerequisite* to an *Althen* analysis of causation"

and thus "in the absence of a showing of the very existence of *any specific injury* of which the petitioner complains, the *question of causation is not reached*." 656 F.3d at 1352–53 (emphases added) (citing *Broekelschen*, 618 F.3d at 1336, 1349).

In this case, the Special Master's opinion reveals a thorough and careful evaluation of all the evidence to ascertain which injury is best supported by the record. After finding that no "defined and recognized injury" was supported by the record—a finding we affirm, as discussed above—she dismissed the case without attempting to perform an *Althen* analysis for causation to a non-existent injury. That approach was in accordance with this court's precedent and therefore involved no legal error.

CONCLUSION

We have considered the remaining arguments but find them to be unpersuasive. For the foregoing reasons, we affirm the decision of the Claims Court.

**AFFIRMED**

COSTS

No costs.