NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

_____

**TASHA LOYD, PARENT AND NEXT FRIEND OF C.L., A MINOR,**
*Petitioner-Appellant*

**v.**

**SECRETARY OF HEALTH AND HUMAN SERVICES,**
*Respondent-Appellee*

_____

2022-1371

_____

Appeal from the United States Court of Federal Claims in No. 1:16-vv-00811-EGB, Senior Judge Eric G. Bruggink.

_____

Decided:  February 10, 2023

_____

RICHARD GAGE, Richard Gage, PC, Cheyenne, WY, argued for petitioner-appellant.

TYLER KING, Torts Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent-appellee.  Also represented by BRIAN M. BOYNTON, C. SALVATORE D'ALESSIO, TRACI PATTON, HEATHER LYNN PEARLMAN.

_____

Before LOURIE, TARANTO, and STOLL, *Circuit Judges*.

STOLL, *Circuit Judge*.

This is a case brought under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-1 to -34, as amended (the Vaccine Act). Tasha Loyd filed a petition under the Act on behalf of her minor daughter C.L., alleging that the vaccinations C.L. received caused her chronic immune thrombocytopenic purpura (ITP). The special master found that Ms. Loyd had not demonstrated by a preponderance of the evidence that the vaccines caused C.L.'s chronic ITP, and the Court of Federal Claims affirmed. For the reasons explained below, we determine that the special master did not abuse his discretion in making that finding. We thus affirm the decision of the Court of Federal Claims.

## BACKGROUND

Ms. Loyd's petition alleged that C.L.'s second dose of the pneumococcal conjugate vaccine (PCV or Prevnar®), which she received on August 30, 2013, caused C.L.'s chronic ITP.[1] C.L.'s medical history, both before and after the second dose of the Prevnar vaccine, is relevant to this appeal.

C.L. was born a healthy baby in January 2013. For the first several months of her life, C.L. saw her pediatrician, Dr. Laura Heimback-Graham, for regular well-child visits and received her initial rounds of vaccinations. During and after these visits, Ms. Loyd did not report any adverse reactions to these vaccines.

---

[1] While the petition lists both the Prevnar vaccine and the Haemophilus influenzae type b vaccine as allegedly causing C.L.'s ITP, the evidence before the special master, the decisions of the special master and the Court of Federal Claims, and the parties' briefing focus only on the Prevnar vaccine. *See, e.g.*, Appellee's Br. 11 n.1.

On August 30, 2013, C.L. returned to Dr. Heimback-Graham and received, among other vaccines, the second dose of the Prevnar vaccine. At this visit, Ms. Loyd reported that C.L. had recently been fussier than normal and had white patches on her tongue. Dr. Heimback-Graham diagnosed C.L. with thrush and prescribed an antifungal medication to address these concerns. The medical records from this visit indicate that Ms. Loyd did not report any further concerns or complaints.

Over three months after her second dose of the Prevnar vaccine, on December 2, 2013, C.L. returned to Dr. Heimback-Graham to treat an infected earlobe piercing. C.L. visited Dr. Heimback-Graham again in January 2014, over four months after the vaccine, to treat fever, cough, and congestion. Medical records from both visits indicate that no other health complaints were raised, and physical examinations of C.L. were otherwise normal.

C.L. returned to her pediatrician for her one-year well-child visit on February 3, 2014. Ms. Loyd reported that she did not want C.L. to receive her scheduled vaccinations because C.L. was allegedly "not herself" for some time after receiving her previous vaccinations, although the medical records from this visit do not provide any further detail. J.A. 94. At this visit, Dr. Heimback-Graham performed a complete blood test (CBC), which revealed that C.L. had normal levels of blood platelets (specifically, 340,000/µL).[2]

---

[2] The medical literature submitted as evidence before the special master explains that normal blood platelet levels in infants range from about 200,000 to 475,000/µL. *Loyd v. Sec'y of Health & Hum. Servs.*, No. 16-811V, 2021 WL 2708941, at \*2 n.3 (Ct. Cl. May 20, 2021) (citing K. Pagana & T. Pagana, *Mosby's Manual of Diagnostic and Laboratory Tests* 156, 362 (6th ed. 2018)). Physicians can diagnose vaccine-associated ITP when a child's platelet levels measure below 100,000/µL. *Id.* (citing V. Cecinati et al.,

Six weeks after this visit, in March 2014, C.L. again visited her pediatrician to treat a fever. Like the multiple previous visits, the medical records state that no other concerns or complaints were raised.

On June 2, 2014—approximately nine months after receiving the second dose of the Prevnar vaccine—C.L. returned again to see Dr. Heimback-Graham. The medical records from this visit note excessive bruising, a tell-tale symptom of ITP, for the first time. *See* J.A. 279–81 (Ms. Loyd reporting a two-week history of bruising). Dr. Heimback-Graham ordered two CBC tests. Unlike the February 2014 CBC test, the results from these two tests revealed that C.L.'s blood platelet counts were low (specifically, $34,000/\mu L$ and $23,000/\mu L$). Dr. Heimback-Graham referred C.L. to a pediatric hematologist, who diagnosed C.L. with acute ITP that same day. Since her diagnosis, C.L. has continued to receive treatment for her ITP—which was classified as chronic ITP in 2015—and her blood platelet levels have been repeatedly tested and have remained consistently low.

On July 8, 2016, Ms. Loyd filed a Vaccine Act petition on behalf of C.L. The special master assigned to the case held a hearing and ultimately found, among other things, that the onset of C.L.'s ITP did not occur until, at the earliest, May 2014, the first time at which her medical records indicate symptoms of ITP. *Loyd v. Sec'y of Health & Hum. Servs.*, No. 16-811V, 2021 WL 2708941 (Ct. Cl. May 20, 2021) ("*Special Master Decision*"). In large part because of the length of time between the allegedly causative vaccination and this onset date—eight to nine months—the special master found that the record did not establish that C.L.'s chronic ITP was more likely than not caused by the

---

*Vaccine Administration and the Development of Immune Thrombocytopenic Purpura in Children*, 9 HUM. VACCINES & IMMUNOTHERAPEUTICS 1, 2 (2013)).

Prevnar vaccine. *Id.* at *28. Ms. Loyd moved for review of the special master's decision in the Court of Federal Claims. That court determined that the special master's decision was neither arbitrary nor capricious and thus affirmed. J.A. 46–69.

Ms. Loyd timely appealed, and we have jurisdiction under 28 U.S.C. § 1295(a)(3) and 42 U.S.C. § 300aa-12(f).

## DISCUSSION

Petitioners can qualify for compensation under the Vaccine Act in two ways. First, "if the petitioner can establish an injury listed on the Vaccine Act Injury Table that occurred after the administration of a designated vaccine within a designated period of time ("Table cases"), then causation is presumed." *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1354 (Fed. Cir. 2019). Second, if a petitioner claims an injury not listed on the table (i.e., in an "off-Table" case), then she "must prove, by a preponderance of the evidence, that the vaccine was the cause-in-fact of the claimed injury." *Id.*; 42 U.S.C. §§ 300aa-11(c)(1)(C)(ii)(I), 300aa-13(a)(1).

To prove causation in an off-Table case, the petitioner must "show by preponderant evidence that the vaccination brought about [the] injury" by establishing each of the three requirements set forth in *Althen v. Secretary of Health & Human Services*, 418 F.3d 1274, 1278 (Fed. Cir. 2005): (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury. *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321–22 (Fed. Cir. 2010) (quoting *Althen*, 418 F.3d at 1278). If a petitioner has satisfied all three *Althen* prongs by a preponderance of the evidence, she is entitled to compensation unless the government shows "by a preponderance of the evidence[] that the injury was in fact caused by factors unrelated to

the vaccine." *Althen*, 418 F.3d at 1278 (quoting *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 547 (Fed. Cir. 1994)).

Under the Vaccine Act, the Court of Federal Claims reviews a special master's decision to determine whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 300aa-12(e)(2)(B). Because we review de novo the Court of Federal Claims' decision regarding a special master's decision to deny entitlement to compensation under the Vaccine Act, we effectively "perform[] the same task as the Court of Federal Claims and determine[] anew whether the special master's findings were arbitrary or capricious." *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1360 (Fed. Cir. 2000). We do "not reweigh the factual evidence, assess whether the special master correctly evaluated the evidence, or examine the probative value of the evidence or the credibility of the witnesses—these are all matters within the purview of the fact finder." *Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1249 (Fed. Cir. 2011). In general, reversible error is "extremely difficult to demonstrate" if the special master "has considered the relevant evidence of record, drawn plausible inferences[,] and articulated a rational basis for the decision." *Hines v. Sec'y of Health & Hum. Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991).

On appeal, Ms. Loyd makes two arguments: (1) that the special master's finding that the onset of C.L.'s ITP did not occur until, at the earliest, May 2014 was arbitrary and capricious, Appellant's Br. 25–31; and (2) that the special master applied the wrong legal standard by requiring the petitioner to prove the first *Althen* prong by a preponderance of the evidence, *id.* at 31–41.

Regarding Ms. Loyd's first argument, the special master, "[a]fter considering the parties' respective positions and supporting evidence," found "that the onset of C.L.'s

chronic ITP more likely than not occurred in May 2014."
*Special Master Decision* at *25. In making this determina-
tion, the special master explicitly considered all of the evi-
dence provided by Ms. Loyd. Specifically, he considered
and discussed, among other things, Ms. Loyd's own testi-
mony, *id.* at *5–7; photographs taken by Ms. Loyd that al-
legedly showed bruising on C.L. in the fall of 2013,[3] *id.*
at *16; a prescriber reference for Prevnar, which listed
warnings for providers, *id.* at *8; reports on the Vaccine
Adverse Events Reporting System listing adverse reactions
to the Prevnar vaccine, *id.*; and a letter from Dr. Berger,
one of C.L.'s treating physicians who did not testify at the
hearing, *id.* at *15–16. Finally, the special master dis-
cussed at particular length the testimony of petitioner's ex-
pert, Dr. Gershwin, who presented his medical theory at
the hearing that the Prevnar vaccine could have caused
C.L.'s chronic ITP through a concept called "molecular
mimicry." *Id.* at *7–11.

The special master also considered the evidence sub-
mitted by the government, such as many pieces of medical
literature, including large scale epidemiological studies
that showed no significant link between Prevnar and ITP,
*id.* at *13–15; C.L.'s medical record itself, which did not
have any indication of ITP symptoms until, at the earliest,
two to three weeks before June 2, 2014, *id.* at *1–5; and the
testimony from the government's two medical experts,
Dr. Strouse and Dr. MacGinnitie, *id.* at *11–15. The gov-
ernment's experts uniformly testified that Dr. Gershwin's
molecular mimicry theory was unlikely. In Dr. Strouse and

---

[3]    The special master noted that several of these pho-
tographs were neither authenticated nor had any metadata
indicating the date on which they were taken. Despite
these authentication deficiencies, the special master con-
sidered them as part of his weighing of the evidence. *Spe-
cial Master Decision* at *16, *27 n.27.

Dr. MacGinnitie's view, this theory was unlikely, in part because it had only been used to connect other, non-Prevnar vaccines to ITP. It was also unlikely, in their view, because C.L.'s medical record—which showed normal platelet counts in February 2014, five months after receiving the vaccine—controverted Dr. Gershwin's theory that the onset of C.L.'s ITP occurred shortly after vaccination. The government's experts also testified regarding the photographs submitted by Ms. Loyd. The two experts agreed that while the photographs did show "some evidence of bruising," they did not show petechiae, a unique type of bruising associated with ITP. *Id.* at \*11–12, \*15. The experts explained that the photographs instead showed bruising that was "typical" and not unusual for a young child of C.L.'s age. *Id.*

For each piece of evidence presented, both by Ms. Loyd and by the government, the special master discussed its relevance to the case, its credibility, and its strength; in other words, the special master weighed each piece of evidence. On balance, the special master found that it was more likely than not that the onset of C.L.'s chronic ITP was no earlier than May 2014. *Id.* at \*24–27. The special master further explained that it was undisputed that an onset date of May 2014—more than nine months after C.L. received the second dose of Prevnar—was too remote from the date of vaccination to conclude that Prevnar caused C.L.'s condition. *Id.* at \*28 (noting that "Dr. Gershwin . . . conceded that an onset of five to ten months post-vaccination would not be medically acceptable for purposes of proving vaccine causation"); J.A. 54 (Court of Federal Claims noting same concession). Accordingly, the special master determined that the petitioner had not met her burden to prove *Althen* prong three, which requires a proximate temporal relationship between the vaccination and the injury.

In view of the special master's analysis and the evidence of record, we conclude that this factual finding—that C.L.'s chronic ITP more likely than not began no earlier

than May 2014—was not arbitrary or capricious. The special master's factfinding is supported by the evidence of record, including, among other things, C.L.'s medical records, which did not note any symptoms of ITP until two to three weeks before her June 2, 2014, medical visit. In addition, the special master found credible the testimony of the government's experts that the Prevnar vaccine has not been linked to ITP and that Dr. Gershwin's proposed medical theory was unlikely. We do not see that the special master's factfinding on this point was unreasonable. In other words, "the special master has considered the relevant evidence of record, drawn plausible inferences[,] and articulated a rational basis for the decision," *Hines*, 940 F.2d at 1528, and thus his finding is not arbitrary or capricious.

On appeal, Ms. Loyd argues that certain evidence conflicts with the special master's ultimate conclusion. Specifically, Ms. Loyd highlights the photos she presented showing bruising on C.L. and Dr. Gershwin's testimony that he once treated a patient whose platelet levels would vary when presented with poison oak, a phenomenon which could potentially explain C.L.'s normal platelet levels in February 2014. Appellant's Br. 27–29. First, to the extent that there are conflicts in the testimonial evidence presented at the hearing, those conflicts were for the special master to resolve. *See Lampe*, 219 F.3d at 1362 (A special master's "assessments of the credibility of the witnesses . . . are virtually unchallengeable on appeal."). Second, at bottom, Ms. Loyd's appellate argument on this issue essentially asks us to reweigh the evidence, something we cannot do under the arbitrary and capricious standard of review. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Porter*, 663 F.3d at 1249 ("[E]valuat[ing] the evidence, . . . [and] examin[ing] the probative value of the evidence or the credibility of the witnesses . . . are all matters within the purview of the fact finder."). Because the special master's fact finding is "based on evidence in the record that is not

wholly implausible, we are compelled to uphold that finding as not being arbitrary or capricious." *Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1338 (Fed. Cir. 2010) (cleaned up). And given Dr. Gershwin's concession that this date precludes a finding of causation under *Althen* prong three, we thus affirm the special master's determination that the petitioner has not shown that each of the *Althen* prongs has been met.

Ms. Loyd also argues on appeal that the special master applied an improper legal standard in his analysis of *Althen* prong one. Appellant's Br. 31–41. As explained above, however, our affirmance of the special master's fact finding that the onset of C.L.'s ITP was no earlier than May 2014 resolves *Althen* prong three against the petitioner. Accordingly, we need not and do not reach this argument regarding *Althen* prong one.

## CONCLUSION

Like the special master, we "have great sympathy . . . for [Ms. Loyd's] desire to ascertain a possible cause for C.L.'s medical distress." *Special Master Decision* at \*32. The special master's comprehensive decision, however, was based on a thorough examination of the large body of evidence submitted in this case. We agree with the Court of Federal Claims that the special master's weighing of that evidence was neither arbitrary nor capricious. We therefore affirm.

## **AFFIRMED**

### COSTS

No costs.